**AFFILIATED RESEARCH, INC.**

v.

**The UNITED STATES.**

No. 315-60.

United States Court of Claims.
Oct. 15, 1965.

Frederick R. Tansill, Washington, D. C., attorney of record, for plaintiff. Goodwin, Rosenbaum, Meacham & White, Abe Siegel, Washington, D. C., and Leon, Weill & Mahony, New York City, of counsel.

S. Laurence Shaiman, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. C. Moxley Featherston, Lyle M. Turner, and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, and COLLINS, Judges.

COLLINS, Judge.

The issue in this action for the refund of corporate income taxes is whether plaintiff is entitled to a deduction for certain amounts which, according to

plaintiff, constituted interest payments.[1] Defendant contends that the payments in question were dividends, not interest. In order to resolve this dispute, we must determine whether the advances with respect to which the payments were made represented (1) loans to plaintiff or (2) contributions to the capital of plaintiff.

The factual background, which is set forth in detail in the findings of fact, can be summarized as follows: During the pertinent years, ownership of plaintiff's capital stock was divided equally among three brothers, Ralph, Norman, and Eli Freydberg. Plaintiff was engaged in chemical research and engineering, practically all of its work being done for companies controlled by the Freydbergs. In October 1950, the brothers learned that it might be possible for them to obtain one-half of the voting stock of Consolidated Trimming Corporation (hereinafter "Consolidated"), a manufacturer of furniture trimmings and other products.

At the time, the two principal stockholders of Consolidated were William Rosenberg, its president, and Joseph Bernhard, its vice president. Rosenberg was considering disposing of at least part of his interest in the company. In January 1951, Eli Freydberg entered into negotiations with Rosenberg, and eventually the latter indicated willingness to sell for the price of $500,000 a total of 10,000 shares, consisting of 7,500 shares of non-voting stock and one-half of the voting stock, 2,500 shares. The Freydberg brothers concluded that Consolidated presented a favorable investment opportunity, especially in view of the fact that Bernhard was agreeable to substituting Eli Freydberg for Rosenberg in the management of Consolidated.

Eli Freydberg informed Rosenberg that the offer was acceptable. However, before the sale was consummated, Bernhard learned for the first time that the purchase was to be made by the three brothers rather than by Eli individually. Bernhard stated that, with regard to voting and control, he preferred to deal with a single owner, not three. Thus, it was decided that ownership of the Freydberg shares should be placed in a corporation and that plaintiff should be used for this purpose.

Of the $500,000 needed for the purchase, plaintiff received $205,000, less discount, from the Irving Trust Company; the interest rate for this loan was 3½ percent per annum. As conditions for this loan to plaintiff, the bank required the personal guarantees of the brothers, the pledge of the Consolidated shares, and the subordination to the bank's loan of any subsequent advances which would be made to plaintiff for the purchase of the Consolidated shares.

Plaintiff obtained the remaining amount, $301,000, from the following sources: the three brothers; an inter vivos trust which had been created by the parents of the brothers for the benefit of the brothers' wives and children; and the estate of Aaron Freydberg, the father of the brothers. Ralph and Eli were the trustees of the inter vivos trust; and the three brothers were the co-executors and the sole beneficiaries of their father's estate. The advances from these sources were evidenced by demand notes bearing interest at 5 percent per year. The sale was effected on April 10, 1951, and, on that date, each of the conditions required by the bank was met.

On October 10, 1951, the maturity date of its note, the Irving Trust Company required partial repayment to the extent of $55,000. To assist plaintiff in making the repayment, the estate advanced an additional $42,500 in exchange for another 5 percent demand note. Also, Ralph and Norman each advanced the sum of $5,000; no notes were issued to them, but these amounts were reflected in an account on which plaintiff was to make

---

1. Four years are involved, i.e., plaintiff's fiscal years ending September 30, 1954, through September 30, 1957. The pertinent statutory provisions, which are essentially identical, are § 163, Int.Rev.Code of 1954, and § 23(b), Int.Rev.Code of 1939, 53 Stat. 12.

For a definition of the term "dividend," see § 316, Int.Rev.Code of 1954, and § 115(a), Int.Rev.Code of 1939, 53 Stat. 46.

interest payments. On October 23, 1951, the bank released the subordination agreement and the subordinated notes; and, on December 7, 1951, the voting common stock was returned to plaintiff. On December 5, 1951, Consolidated had guaranteed the loan made to plaintiff by the bank.

On June 11, 1952, the balance of the Irving Trust loan (then $145,000) was assumed by the Public National Bank and Trust Company. The conditions of the Public National loan to plaintiff were like those of the original Irving Trust loan (i. e., subordination of the Freydbergs' notes, etc.); the rate of interest was 4 percent per annum. Subsequent to the years in question, on July 21, 1958, the Public National loan was paid in full.

In addition to those mentioned above, other advances were made to plaintiff by the trust, the estate, and each of the brothers. Certain repayments were made to the trust and to the estate. With but small exceptions, the brothers have neither demanded nor received repayment of their individual advances to plaintiff. Regarding all the advances, plaintiff accrued and paid interest regularly. The precise issue for determination is whether the amounts paid to the estate and to the brothers did in fact represent "interest."

■■ As far as formal matters are concerned, it is clear that plaintiff utilized the characteristics of indebtedness. For example, most of the advances were evidenced by promissory notes. However, the rule is well established that form is not controlling. See, e. g., Gilbert v. Commissioner, 262 F.2d 512, 513 (2d Cir.), cert. denied, 359 U.S. 1002, 79

S.Ct. 1139, 3 L.Ed.2d 1030 (1959). In order to ascertain the true nature of transactions cast in the form of indebtedness, the courts look to all the surrounding circumstances. Although a fairly well-defined set of tests has evolved, see, e. g., O. H. Kruse Grain & Milling v. Commissioner, 279 F.2d 123, 125 (9th Cir. 1960), "[t]here is no one characteristic * * * which can be said to be decisive in the determination of whether the obligations are risk investments in the corporations or debts." John Kelley Co. v. Commissioner, 326 U.S. 521, 530, 66 S.Ct. 299, 304, 90 L.Ed. 278 (1946).

With regard to the present case, it is our conclusion that the advances in question were not loans, but were, as the Government contends, contributions to the capital of plaintiff. Perhaps, the most effective way to demonstrate certain of the reasons for our decision would be to contrast the bank loans, on the one hand, and, on the other, the advances by the Freydbergs and the estate.

■■ One significant factor is the matter of risk. E. g., Diamond Bros. Co. v. Commissioner, 322 F.2d 725, 732 (3d Cir. 1963). If the repayment of certain advances is dependent upon the success of the recipient corporation, this suggests that the amounts were in fact an equity investment.[2] E. g., Dobkin v. Commissioner, 15 T.C. 31, 34 (1950), aff'd per curiam, 192 F.2d 392 (2d Cir. 1951). With regard to the case at bar, the banks clearly wished to minimize the degree of risk to which their loans would be subject. As stated above, each of the lending institutions insisted upon personal guarantees, the pledge of consolidated stock, and the subordination of other advances.[3] The Freydbergs, however, re-

---

2. Plaintiff asserts that, with regard to the factor of risk, there is no meaningful distinction between loans and contributions to capital. We do not agree. It is true, as stated in Byerlite Corp. v. Williams, 286 F.2d 285, 292 (6th Cir. 1960), that any unsecured loan involves "more or less risk." However, all risks are not the same. In dealing with a particular case, it is important to determine the *nature and degree* of the risk assumed. See, e.g., Moughon v. Commissioner, 329 F.2d

399, 401 (6th Cir. 1964). In the case at bar, the banks sought to insulate their chances of repayment from the vicissitudes of the business enterprises, but, as will be indicated, the same was not true of the Freydbergs.

3. Between October 23, 1951, and June 11, 1952, no subordination agreement was operative. This lapse does not alter our conclusion regarding the overall significance of the agreements.

ceived no such protection. Rather, repayment of their advances "depended upon the success of Consolidated and its earnings as a going concern." This undisputed fact is unfavorable to the position of plaintiff.

If, as was originally intended, the brothers had bought the Consolidated shares directly, the present case would never have arisen. Their position as stockholders of Consolidated would have been obvious, and plaintiff corporation would not have been involved. As it turned out, though, plaintiff was utilized to accomplish the change of ownership of the Consolidated stock. However, the crucial fact is that, from the standpoint of the risk assumed by the Freydbergs, the intervention of plaintiff had virtually no effect. Had the brothers made a direct purchase of the Consolidated shares, the worth of their investment would have hinged upon the successful operation of that company. The very same contingency governed repayment of the advances in question. This is a forceful indication that the advances were actually capital contributions. Cf. Gilbert v. Commissioner, supra, 262 F.2d at 514.

The fact of subordination has itself been stressed. For example, in P. M. Finance Corp. v. Commissioner, 302 F.2d 786, 789 (3d Cir. 1962), the court stated:

> * * * The complete subordination * * * [of the rights of debenture-holders to the rights of various banks] not only tends to wipe out a most significant characteristic of the creditor-debtor relationship, the right to share with general creditors in the assets in the event of dissolution or liquidation, * * * but it also destroys another basic attribute

of creditor status: i. e., the power to demand payment at a fixed maturity date. * * *

In the instant case, for almost the entire period involved, subordination agreements were in effect.[4] This meant that, to a considerable extent, the debtor-creditor attributes referred to in P. M. Finance Corp., supra, were absent. First, if plaintiff had been dissolved, the Freydbergs and the estate would not have enjoyed a status equal to that of either of the banks. Secondly, although the notes were demand in form, the right to demand repayment could not properly be exercised until the bank loans had been paid in full.[5] Cf. General Alloy Casting Co., T.C.Memo. No. 64–148 (May 28, 1964).

▄▄ Of course, another basic distinction between the advances under consideration and the bank loans is the fact that the latter were made by outside parties. The Freydberg brothers were the sole owners of plaintiff corporation. Moreover, we agree with defendant that the advances by the estate should be treated in the same manner as those by the brothers. Since the brothers were both the executors and the sole beneficiaries of the estate, it would be unrealistic to treat the estate as though it were a disinterested third party.[6] Cf. Commissioner v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945).

In a number of cases, the courts have inquired as to whether an outsider would have made advances on the same conditions as those under consideration. E. g., O. H. Kruse Grain & Milling v. Commissioner, supra, 279 F.2d at 126. Here, we have found that, in 1951, it would have been impossible for plaintiff, on the basis

---

4. See footnote 3, supra.

5. In fact, certain repayments were made, in technical violation of the subordination agreements, to the brothers, the trust, and the estate. With these exceptions, the terms of the agreements were observed.

6. Plaintiff asserts that it was inconsistent for the Government to allow the deductions for payments made to the trust and to disallow those made to the estate. Whether or not this differential treatment was valid, it does not afford the basis for recovery by plaintiff. In order to prevail, plaintiff must make a positive showing of its entitlement to the deductions in question.

of its own assets, "to have borrowed from unrelated or commercial sources any substantial part of * * * [the $330,500 received from the brothers and the estate] on the same terms * * *." Finding 30. This is an additional factor which is adverse to the position of plaintiff.

■ When one-third of the amount received from the estate is attributed to each of the brothers, their 1951 advances to plaintiff are substantially proportional to their ownership of plaintiff's capital stock,[7] and, to a great extent, this proportionality continued in the later years. This, according to defendant, is further evidence that the advances were in fact additional risk capital. Defendant's argument is a valid one, for there was a sufficiently high degree of equality among the respective total advances of the brothers. Cf. Gilbert v. Commissioner, supra, 262 F.2d at 514.

Defendant asserts that, if the advances by the shareholders were actually debt, then their equity in plaintiff was "nominal." That is, according to defendant's calculations, plaintiff had a debt-equity ratio of approximately 131 to 1 on the date the original advances were made. Defendant used as shareholder equity the amount of $3,870.83 and as total indebtedness, $506,000.[8]

Plaintiff disputes defendant's approach to this matter. First, plaintiff asserts that defendant failed to acknowledge the true worth of the stockholder equity. Citing, *inter alia*, In re Estate of Miller

v. Commissioner, 239 F.2d 729, 733 (9th Cir. 1956), plaintiff contends that real values, not book values, should be used in computing the ratio. According to plaintiff, the real value of the Consolidated shares was in excess of the book value of $500,000 and such excess should be included in the equity figure.

We cannot accept this argument of plaintiff, for we are unable to conclude that, *as of April 10, 1951,* the actual value of the Consolidated shares was greater than the value reflected on plaintiff's books. The price at which Rosenberg sold his Consolidated stock, $50 per share, was arrived at through arm's-length transactions. Thus, we consider that price to be the best indication of the real worth of the stock as of April 10, 1951. Cf. United States v. Davis, 370 U.S. 65, 72, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962). It follows that, on that date, the real and book values were the same.

■ Plaintiff correctly points out that, as time progressed, the value of the Consolidated shares and the amount of plaintiff's capital increased. However, we are concerned primarily with the situation which existed on April 10, 1951, the date when the greatest part of the advances was made. Cf. Diamond Bros. Co. v. Commissioner, supra, 322 F.2d at 731. Even accepting plaintiff's view that non-shareholder debt should be excluded, the ratio as of April 10, 1951, was an extremely high one.[9] As is true of the other factors, the debt-equity ratio is not in itself decisive.[10] Cf. Rowan v.

---

7. In 1951, the estate advanced a total of $240,500. One-third of this amount is $80,166.67. Attributing one-third to each brother, their total advances in 1951 were as follows: Ralph, $105,166.67; Eli, $116,166.67; and Norman, $109,166.67.

8. As the amount of debt, defendant used the total of (1) the bank loan and (2) the advances by the trust, the estate, and the brothers. The amount of equity represents the average of plaintiff's capital stock, earned surplus, and undivided profit at the beginning and at the end (September 30, 1951) of the fiscal year which included the date of the original advances.

9. On the date in question, non-shareholder debt totaled $228,000 (i.e., Irving Trust Co., $205,000; the trust, $23,000). Thus, the ratio of shareholder debt to equity was $278,000 to $3,870.83 (see footnote 8, supra) or approximately 72 to 1

10. Citing Earle v. W. J. Jones & Son, Inc., 200 F.2d 846 (9th Cir. 1952), plaintiff asserts that even an apparently high debt-equity ratio may be justified by the prospect of future earnings. This contention is essentially a variation of the doctrine that a particular factor must not be viewed in isolation, but must be considered in light of all the circumstances.

United States, 219 F.2d 51, 55 (5th Cir. 1955). Still, here, the ratio lends support to our conclusion.

To summarize, we hold that plaintiff is not entitled to a deduction for the amounts paid with respect to the advances made by the Freydberg brothers and by the Aaron Freydberg estate. We wish to indicate, however, that, although our decision is adverse to plaintiff, we do not accept the suggestion by defendant that the purpose of the Freydbergs was to devise a "tax avoidance scheme." In our view, it is not necessary, nor would it be proper, to attribute such motives to the Freydberg brothers. Nonetheless, we consider the factors discussed above to be sufficient to show that the substance of indebtedness was lacking. It follows, therefore, that plaintiff is not entitled to recover, and the petition is dismissed.

Here, the fact that Consolidated appeared originally to be and actually turned out to be a sound investment is not determinative. Our study of the relevant transactions compels the conclusion that the advances in question did not result in a true debtor-creditor relationship.