**SAYLES FINISHING PLANTS, INC.**

v.

**The UNITED STATES.**

**No. 5-64.**

United States Court of Claims.

July 17, 1968.

Robert E. Jacobson, Providence, R. I., attorney of record for plaintiff; John V. Kean, Edwards & Angell, Providence, R. I., and Philip F. Herrick, Washington, D. C., of counsel.

Edna G. Parker, Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant; Philip R. Miller, Washington, D. C., of counsel.

## OPINION

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

PER CURIAM:

This case was referred to Trial Commissioner Roald A. Hogenson with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on January 25, 1968. On June 21, 1968 the parties filed a stipulation wherein, among other things, it is stipulated that the court may enter judgment in accordance with the Trial Commissioner's opinion, findings of fact, and recommended conclusion of law which may be adopted by the court. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF COMMISSIONER

HOGENSON, Commissioner:

This is a suit to recover federal income taxes and assessed interest paid by plaintiff to defendant for calendar years 1955, 1956, and 1957, plus statutory interest. The suit arises as a result of defendant's disallowance in each year of a claimed deduction for interest paid.[1] Defendant's contention is that these payments, alleged to be interest on indebtedness, were actually distributions of profits as dividends. Thus this case presents one more variation of the familiar debt-versus-equity controversy. For the reasons hereinafter stated, it is my opinion that plaintiff is not entitled to recover.

Plaintiff is a Rhode Island corporation engaged in the textile finishing business, with its principal location in Saylesville, Rhode Island. Plaintiff is the ultimate successor to the business conducted at the same location by Frank A. Sayles some 50 years ago. Upon Mr. Sayles' death in 1920, his executors caused the business to be incorporated as Sayles Finishing Plants, Inc. (referred to herein as "old Sayles"), a separate entity from the plaintiff herein. Two years later in 1922, the executors created plaintiff corporation, then named Remaw Manufacturing and Investments Company (hereinafter "old Remaw"), which was used to hold certain investments. Plaintiff as old Remaw became inactive in 1925 and remained so until May of 1930, when a plan was formulated to reorganize both plaintiff and old Sayles.

Under this plan, plaintiff as old Remaw acquired virtually all the assets of old Sayles, and changed its name to Sayles Finishing Plants, Inc., hereinafter referred to as plaintiff or new

1. Section 163 of the Internal Revenue Code of 1954, 68A Stat. 46, provides for deduction of all interest paid or accrued within the taxable year on indebtedness.

Sayles. Plaintiff then undertook the active operation of the textile finishing business. Old Sayles changed its name to Remaw Corporation and thereupon became inactive. The conduct of the business by plaintiff after this reorganization was virtually identical to that occurring previously; there were no significant changes in the plant or its operation, nor in its personnel or management, nor in the business activities.

The reorganization was essentially in the form of a sale to plaintiff of all the stock of old Sayles, accompanied by a recapitalization of both companies. Neither corporation was in financial difficulty at the time, and the plan did not involve any new investment of money in either company. Prior to the reorganization, the executors of Mr. Sayles' estate (sole stockholders of both old Sayles and old Remaw) had transferred all the stock of both corporations to the trustees of four trusts created under eighth clause of Mr. Sayles' will. Immediately after the reorganization, the eighth clause trustees held all of plaintiff's stock, as well as $7,000,000 in 6 percent demand notes of plaintiff. Plaintiff in turn held all the stock of new Remaw, hereinafter called Remaw.

The trustees devised the above-mentioned plan of reorganization and recapitalization as a means of affording greater protection to the trust beneficiaries. This was deemed advisable in light of the financial and economic outlook as of May 1930.

One year later, in May of 1931, additional changes were made whereby Remaw authorized and issued an additional 4,998 shares of common stock and an issue of 70,000 shares of preferred stock, both of $100 par value per share. Plaintiff subscribed to the common for $100 per share in cash, and also paid $200 for the two shares of Remaw common it already held (and which had been all of the authorized and issued common stock of Remaw). The preferred stock was issued to the trustees, in exchange for the $7,000,000 in plaintiff's demand notes, which the trustees transferred to Re-

maw. Thus Remaw became active as a holding company for investments.

In June of 1934, another plan of recapitalization and reorganization was conceived and put into effect. Of the 5,000 shares outstanding of common stock of Remaw, 4,500 were retired, and the eighth clause trustees purchased the remaining 500 shares from plaintiff. Then plaintiff issued 6 percent registered bonds having an aggregate face value of $7,050,000 in exchange for all the assets of Remaw (except Remaw's corporate charter and any claims it might have for tax refunds). Remaw's assets at this time consisted of the $7,000,000 in plaintiff's demand notes of 1930, and other assets having a net value of approximately $50,000. Plaintiff's bonds were issued directly to the trustees, upon the surrender to Remaw by the trustees of all the outstanding stock of Remaw (70,000 shares of preferred and 500 shares of common). Remaw promptly canceled this stock and then amended its articles of association to authorize instead capital stock of four shares, par value $100 per share. These four shares were issued to the trustees, whereupon Remaw became completely inactive, remaining so until its dissolution in 1960.

In the 1934 transactions, plaintiff acquired from Remaw plaintiff's 1930 demand notes of $7,000,000 face value, which were then canceled. The issue of $7,050,000 in plaintiff's bonds were in registered form, transferable only on the books of the corporation; they provided for interest at the rate of 6 percent per annum (payable quarterly) and were due and payable on June 1, 1939. These bonds are the subject matter of the present suit.

The economic depression of the 1930's affected the New England textile industry quite adversely, and plaintiff was no exception, for it suffered losses throughout most of this period. Because of this, the 1934 bonds were modified twice during the 1930's. In 1935, the bondholders (the trustees) and Sayles agreed that, until maturity, inter-

est should be payable annually from net income only (before deduction of that interest and any dividends paid), and that such interest would not be cumulative. Likewise, when the bonds became due, on June 1, 1939, a similar agreement was reached whereby interest ·on $6,050,000 of the bonds would thereafter be payable (at the rate of 6 percent per annum) from net income only, on the same terms as the 1935 agreement imposed. The remaining $1,000,000 was not affected by the 1939 agreement, and interest on this portion of the bonds became due and payable (also at a 6 percent annual rate) regardless of net income. Neither the 1935 modification nor that of 1939 conferred any additional rights or privileges upon the bondholders, and no consideration was paid in this connection.

No payments have been made on the principal of the bonds, and none has been demanded by the bondholders. Plaintiff has made purported interest payments on the bonds in accordance with their terms, as modified, in each of the taxable years involved here, as well as in prior and subsequent years. Income tax returns filed by plaintiff for 1955, 1956, and 1957 claimed a deduction of $423,000 in each year as interest accrued and paid on these bonds. Upon audit of these returns, the Commissioner of Internal Revenue disallowed the claimed deductions for interest paid, on the ground that these payments were actually profit or dividend distributions.

On November 12, 1959, deficiencies totaling $656,188.60 (plus interest thereon of $105,405.57) were assessed, and plaintiff paid these amounts that same day. Timely refund claims were filed on October 30, 1961, and these were disallowed on January 8, 1962.

Subsequently, on audit of plaintiff's 1958 federal income tax return, the Commissioner determined that a net operating loss existed, which would be carried back to reduce plaintiff's 1955 and 1956 tax liabilities. Accordingly, on April 28, 1961, the District Director tendered to plaintiff checks totaling $998,179.32, representing refunds of income taxes paid for 1955 and 1956, plus interest thereon. Plaintiff accepted the checks by letter dated May 5, 1961, reserving its right to further contest its tax liability for those years.

On January 6, 1964, plaintiff filed its petition with this court, seeking (1) a judgment against the defendant in the amount of $349,907.96 (the amount of the rejected refund claims) with interest, and (2) a specific finding by the court that refund of said amount and the above-mentioned refund of April 28, 1961, result in whole or in part from allowance of the disputed interest deduction, and only in part from carryback of the 1958 net operating loss.

The sole issue for determination is whether plaintiff's interest payments arose from actual indebtedness to its bondholder-stockholders, as contended by plaintiff, or whether such payments were actually distributions of dividends by way of purported interest payments on instruments which represented capital investment in plaintiff, as defendant insists. As stated by this court in Cuyuna Realty Co. v. United States, 382 F.2d 298, 301, 180 Ct.Cl. 879, 884 (1967), the inquiry in most of the decided cases involving the debt-versus-equity controversy has been whether at the time of issuance of the disputed instruments, the parties intended to create a real debtor-creditor relationship; but such inquiry is not the ultimate test; and the real issue is whether there is "indebtedness" within the taxable year, on which purported interest deductions are allowable. This court further held that the federal income tax law looks to events in each taxable year, so in applying § 163, it is proper for courts to inquire for each taxable year whether there is indebtedness, and interest ceases to be deductible as a real cost of producing income, if with the passage of time it becomes apparent that the parties have no intention of continuing the debtor-creditor relationship.

■ However, as the court recognizes in the *Cuyuna* case, supra, full consider-

ation must be given to all relevant and material facts in this case, as the law is well established that the debt-versus-equity problem is basically a question of fact, to be determined in the light of all the facts and circumstances of the particular case, with no single factor being determinative. Id. 180 Ct.Cl. at 883, 382 F.2d at 300; Jack Daniel Distillery v. United States, 379 F.2d 569, 580–585, 180 Ct.Cl. 308, 325–334 (1967). In applying this rule in a case involving the distinction between debt and equity on the issue of deductibility of a bad debt, American Processing & Sales Co. v. United States, 371 F.2d 842, 848, 178 Ct.Cl. 353, 362–363 (1967), this court stated:

> There is no dearth of cases in this province of tax law. So large is their number and disparate their facts, that for every parallel found, a qualification hides in the thicket. At most they offer tentative clues to what is debt and what is equity for tax purposes; but in the final analysis each case must rest and be decided upon its own unique factual flavor, dissimilar from all others, for the intention to create a debt is a compound of many diverse external elements pointing in the end to what is essentially a subjective conclusion. * * *

■ Upon consideration only of the form of the disputed bonds, as originally issued and before their modification by the 1935 and 1939 agreements, it would be concluded that the parties involved intended thereby to create indebtedness. The form of the bonds satisfied the well-stated definition of debt set forth in Gilbert v. Commissioner of Internal Revenue, 248 F.2d 399, 402 (2d Cir. 1957), as follows:

> The classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof. While some variation from this formula is not fatal to the taxpayer's effort to have the advance treated as a debt for tax purposes, * * * too great a variation will of course preclude such treatment. * * * [Citations omitted.]

However, the familiar tax principle that substance prevails over form, Higgins v. Smith, 308 U.S. 473, 477, 60 S.Ct. 355, 84 L.Ed. 406 (1940), calls for consideration of the prior, contemporaneous, and subsequent circumstances relating to the execution and issuance of the disputed instruments. Affiliated Research, Inc. v. United States, 351 F.2d 646, 648, 173 Ct.Cl. 338, 341 (1965); Cuyuna Realty Co. v. United States, supra.

■ The textile finishing business as operated by old Sayles was in sound financial condition at the time of the 1930 transactions. It was not in need of new funds. The beneficial owners of this business, both when operated in corporate form of old Sayles and in that of plaintiff, were the beneficiaries of the four trusts under the eighth clause of the will of Frank A. Sayles, even though prior to the reorganization, all of the stock of old Sayles was held by the sole surviving executor, and thereafter by the eighth clause trustees. No new capital was added to the business by the transactions which transferred such going business unchanged in its personnel, assets and operations from old Sayles to plaintiff. The only accomplishment of apparent substance in the reorganization of the two corporations (old Sayles and plaintiff) was the purported conversion of equity interests of the beneficial owners of the business into purported instruments of indebtedness, by the issuance to the trustees as a result of involved paper transactions of the demand notes of plaintiff in the aggregate sum of $7,000,000. The trustees (one of whom was the sole surviving executor) had in mind only one benefit to the business, i.e., the tax advantage of deducting interest payments on the purported indebtedness. From the standpoint of plaintiff corporation, or the business involved, no other substantial business purpose appears from the evidence. The deliberately planned bene-

fits to the stockholders were to afford greater protection to the trust beneficiaries in that in the event of insolvency or bankruptcy of the business, the trusts would have the right to participate with other creditors to the extent of the $7,000,000 demand note obligations of plaintiff; that if the trustees desired to extract capital from the finishing business, they believed that they could retire up to $7,000,000 of the notes without taxation; and that the trustees would be afforded a convenient means of realizing a part or all of their investment in the business, if they so desired, by selling the demand notes to a third party, in which event they would still have retained control of the business.

Plaintiff's demand notes were transferred in May of 1931 by the trustees to Remaw (old Sayles) in involved paper transactions concerning creation and issuance of additional Remaw common stock to plaintiff and new Remaw preferred stock to the trustees. As previously, the beneficial owners of both Remaw and plaintiff were the beneficiaries of the four eighth clause trusts. The trustees had complete control of both plaintiff and Remaw, and the officers and directors of both corporations were the same. When the paper work had been completed, plaintiff held all of the common stock of Remaw, just as it had before Remaw was caused to increase its common stock; Remaw held the demand notes ($7,000,000) of plaintiff; and the eighth clause trustees (in addition to the previously held common stock of plaintiff) held the preferred stock of Remaw. While cash was transferred from plaintiff to Remaw, there was no new money involved in the overall transactions.

As related above, plaintiff's disputed bonds in the aggregate amount of $7,050,000 were issued to the eighth clause trustees in June of 1934. Here again, mere paper transactions were involved. As before, the ultimate control and ownership of both plaintiff and Remaw were vested in the four eighth clause trusts. In effect, Remaw was caused by the trustees to transfer all of its assets (the $7,000,000 demand notes of plaintiff plus $50,000 in other undefined assets) to plaintiff; all of Remaw's stock (preferred and common) was transferred by plaintiff and the trustees to Remaw and thereupon canceled; Remaw (without assets) issued four shares of common stock to the trustees, but thereafter remained inactive until dissolved in 1960; and plaintiff acquired and canceled its own demand notes, and issued the disputed bonds to the trustees. Thus, the bonds replaced the demand notes as instruments of the purported indebtedness in dispute in this case. Except to the extent of the $50,000 in other undefined assets transferred from Remaw to plaintiff, no additional money was invested in plaintiff in these transactions. No contention is made that to the extent of $50,000, the disputed bonds are a valid indebtedness, but rather is the issue presented here on an all or nothing basis.

■ The parties agree, and it cannot be doubted, that under the facts of a particular case, a stockholder (or stockholders) can also be a creditor (or creditors) holding taxwise a valid indebtedness against their corporation. Plaintiff cites various cases. In Gloucester Ice & Cold Storage Co. v. Commissioner of Internal Revenue, 298 F.2d 183 (1st Cir.1962), a corporation (to acquire the outstanding stock of a competitor) borrowed money from a bank and also issued debenture bonds which were in part exchanged for its outstanding preferred stock and otherwise sold to individuals not stockholders, and the court held that the debentures were evidences of indebtedness in the hands of the nonstockholders and equally so in the hands of the stockholders. In Rowan v. United States, 219 F.2d 51 (5th Cir.1955), the taxpayers had over a period of years made advances in the form of loans to their wholly owned corporation, and the court held that the unpaid portion of such advances was deductible as a worthless debt in the taxable year involved, after a careful review of the evi-

dence on the premise that whether such advances were loans or capital contributions depended on the intent of the parties, to be ascertained from all relevant facts and circumstances. In Wilshire & Western Sandwiches, Inc. v. Commissioner of Internal Revenue, 175 F.2d 718 (9th Cir.1949), taxpayer corporation was incorporated to engage in the restaurant business, and its four incorporators (who became its sole stockholders) advanced $30,000, half of which was to be capital stock contribution and half a loan, and taxpayer's promissory notes were issued for the purported loan to each stockholder accordingly. The court held that the transaction involving the promissory notes was a loan, interest on which was deductible, recognizing, however, that a lending transaction between stockholders and their corporation subjects such transaction to close scrutiny as to the tax effect, but concluding that while there were features both ways as to whether the pertinent advances were loans or stock purchases, those sustaining the loan conclusion greatly preponderated, chief of which was the intent of the parties at the time of entering into the transaction.

Obviously, the facts and circumstances in this case do not parallel the facts and circumstances of the cases cited by plaintiff and reviewed in the foregoing paragraph, and considerable doubt exists as to whether the parties here had a bona fide intention to create indebtedness at the time of the issuance of plaintiff's demand notes or its disputed bonds. Moreover, there were no advances made by plaintiff's stockholders to plaintiff for the issuance of either the demand notes or the disputed bonds.

■ Conversion of equity interests into evidence of indebtedness does not necessarily defeat tax treatment of the resulting relationship between a stockholder or stockholders and the corporation as a bona fide indebtedness. Here again, all of the facts and circumstances of the particular case must be considered. Even the fact that no new money

was invested in the business does not require a holding that issuance of corporate debentures was a capital transaction, but such debentures are to be allowed tax treatment as indebtedness when the other factors in the case establish a true indebtedness. Kraft Foods Co. v. Commissioner of Internal Revenue, 232 F.2d 118, 126 (2d Cir.1956); Luden's, Inc. v. United States, 196 F. Supp. 526, 530-531 (E.D.Pa.1961). However, in an appropriate case, lack of new money can be a significant factor in holding a purported indebtedness to be a capital transaction, particularly when the facts otherwise show that the purported indebtedness was merely a continuation of the equity interests allegedly converted. Golden Belt Lumber Co., 1 T.C. 741, 746 (1943); Briggs Co., 5 T.C.M. 366, 372 (1946); Wetterau Grocer Co. v. Commissioner of Internal Revenue, 179 F.2d 158, 160 (8th Cir.1950); R. C. Owen Co. v. United States, 149 Ct.Cl. 96, 101-102, 180 F.Supp. 369, 372 (1960), cert. denied, 363 U.S. 819, 80 S. Ct. 1256, 4 L.Ed.2d 1516. The disputed bonds in this case were clearly a continuation without change of the equity interests of the bondholder-stockholders, without new money contributed to plaintiff, and without any change in the operations of the business, with the only benefit or advantage to plaintiff being the tax deductibility of interest paid on the bonds.

Even if the disputed bonds had been valid indebtedness at their inception, subsequent conduct of the parties belie their status as a debt in the taxable years here involved. Though purporting to represent a fixed obligation falling due in 1939, the bonds have remained wholly unpaid up to the present time; at no time have the bondholders even made a demand for payment in whole or in part. While the presence of a maturity date is significant evidence of the presence of debt, this factor loses importance when it is observed in form only. While a reasonable extension of the time for payment is not fatal in itself to plaintiff's contentions, Wilshire & West-

ern Sandwiches, Inc. v. Commissioner of Internal Revenue, supra, 175 F.2d at 720–721, an extension for an inordinate period gravitates against the presence of a debt. Plaintiff has offered explanations as to why it saw fit to retain cash for other purposes rather than retiring these bonds, but these explanations are not convincing.

As reasons for nonpayment, plaintiff points to the "adverse business and financial circumstances" at the maturity date, and the "hazardous" nature of its business, necessitating a high degree of liquidity to guard against possible adverse trends. Furthermore, plaintiff asserts that it required large cash balances to enable it to make advances to its subsidiary, American Bleached Goods Company. While the state of the economy in 1939 could conceivably be a valid reason for postponement, plaintiff's explanation for its continuing failure to pay reveals an attitude implying the presence of an equity interest. By leaving this $7,-050,000 to the risks of this "hazardous business," the bondholders were playing the role of stockholders rather than creditors, for this is a basic distinction between the two types of investors.

In addition, the circumstances surrounding the advances to American Bleached Goods show that plaintiff could act the part of a debtor when such was deemed necessary. On several occasions it borrowed money for this purpose and on each occasion the loan was repaid in full. One such loan in the early 1950's amounted to $2.4 million.

■ Proportionality of bondholdings and stockholdings will not void an otherwise valid debt, but it will render the relationship suspect, George E. Warren Corp. v. United States, 135 Ct.Cl. 305, 312, 141 F.Supp. 935, 939 (1956). Here the identity of the bondholders and stockholders appears to be the only substantial factor which would permit such prolonged nonpayment of an alleged debt. Under the circumstances it seems clear that an ordinary creditor would not permit such a prosperous debtor to ignore a $7,000,000 obligation over such a number of years. The evidence shows that from 1939 to 1957 plaintiff had on hand large amounts of cash and liquid assets. While it appears that the needs of the business and principles of sound management required some degree of liquidity, the amounts involved were so large and of such duration as to be inconsistent with an issue of bonds. As with the other factors, nonpayment at maturity is not controlling, but it is effective evidence of an equity interest in situations where no convincing explanation is offered. Thomas Machine Mfg. Co., 23 T.C.M. 1630, 1641–1642 (1964).

During the period in which the alleged bonds were overdue plaintiff paid out substantial amounts as dividend distributions (amounting to over $13 million between 1939 and 1957). Yet no demands were ever made for payment of the bonds; again the inference is that this "debt" could not have been regarded as a serious obligation by the parties. Plaintiff contends that it paid these dividends because it feared imposition of an accumulated earnings tax, since (plaintiff argues) the state of the tax law during the World War II period of prosperity raised doubts as to whether such bond retirement would be a proper purpose for accumulation, sufficient to avoid the accumulated earnings tax. There is arguable authority for the proposition that an accumulation to pay off a debt which could be refinanced is not a reasonable accumulation within the meaning of the accumulated earnings tax provisions, Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 63 S.Ct. 843, 87 L.Ed. 502 (1943). Nevertheless, if it had regarded the bonds as a binding obligation, plaintiff would have felt itself compelled to retire them regardless of the tax consequences. Likewise, a true creditor would not normally consider his debtor's unfavorable tax aspects of repayment. Having chosen to cast their relationship in the form of a debt, the parties were required to accept the bad with the good. Their unwilling-

ness to do so suggests that a debt was not really present.

Considering the facts as a whole, it is concluded that the "unique factual flavor" of this case is that of equity investment. It is doubtful that plaintiff's bonds were taxwise a valid indebtedness at the time of their issuance, and certainly by the taxable years involved they should be considered equity capital. Thus, there was no indebtedness upon which interest accrued within the taxable years 1955–1957.