DESERET NEWS PUBLISHING COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Deseret News Publishing Co. v. Commissioner
Docket No. 4000-73.
United States Tax Court
T.C. Memo 1975-156; 1975 Tax Ct. Memo LEXIS 211; 34 T.C.M. (CCH) 714; T.C.M. (RIA) 750156; May 27, 1975, Filed *211 David E. Salisbury and Alan F. Mecham, for the petitioner. S. Clay Freed, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in Federal income tax of petitioner, Deseret News Publishing Company, as follows: 1963
$ 21,276
1965
36,586
1966
49,843
1967
135,322
We are to decide if certain of petitioner's notes made payable to the Corporation of the President of the Church of Jesus Christ of Latter-Day Saints actually represented a debt outstanding in 1966 and 1967. FINDINGS OF FACT Many of the facts have been stipulated and as stipulated, are found. Petitioner is a corporation organized and existing under the laws of the State of Utah. It has two principal operating divisions: the job printing department which conducts a printing business; and the newspaper department which publishes the Deseret News, an evening newspaper circulated primarily in metropolitan Salt Lake City and other parts of Utah as well as in southern Idaho. From the date of its incorporation, December 28, 1931, until the present, all of the outstanding shares of petitioner's stock, other *212 than qualifying shares owned by the members of its board of directors, have been owned by the Corporation of the President of the Church of Jesus Christ of Latter-Day Saints (L.D.S. Church). At all times relevant, petitioner's principal office and place of business was in Salt Lake City. Its U.S. corporation income tax returns for the years in issue were filed with the District Director of Internal Revenue, Salt Lake City, or the Director of the Western Service Center, Ogden, Utah. Petitioner regularly reported its income and expenses in accordance with the accrual method of accounting. When petitioner was organized, the stock initially issued to the L.D.S. Church was common stock having a par value of $50,000. Additional common stock in the amount of $200,000 was issued in 1935. No further stock was issued until October 1, 1959, when there was a recapitalization to be described later in these findings. Between the date of petitioner's incorporation and the aforesaid recapitalization, the L.D.S. Church made capital contributions to petitioner in the following amounts: 1932
$ 158,244.14
1933
70,000.00
1934
47,680.00
1935
65,000.00
1936
219,064.75
1937
125,880.20
1938
27,000.00
1939
50,402.00
1940
25,801.60
1941
66,101.71
1942
30,353.61
Total
$885,528.01
*213 Thus, immediately prior to the recapitalization of October 1, 1959, capital stock and contributed capital totalled $1,135,528.01. In the latter part of 1947, petitioner's management inaugurated a five-year program aimed at expanding and improving the Deseret News and increasing its circulation. As a result of this program, which coincided with technilogical advances in the printing industry, production costs increased substantially and special promotional expenses were incurred. Petitioner did not pass these additional costs on to its subscribers due to competition from Salt Lake City's other evening newspaper, the SaltLake Telegram(Telegram). Consequently petitioner sustained substantial operational deficits in the years 1948 through 1952: [1]
1948
[1,360,765.29)
1949
(1,921,702.84)
1950
(2,051,203.54)
1951
(2,034,970.30)
1952
(1,370,031.84)
Throughout the period 1948-1952 the L.D.S. Church advanced petitioner the funds necessary to keep it in operation. In recognition of the advances petitioner issued unsecured *214 promissory notes, payable on demand, bearing interest at rates of from three to three and one-half percent per annum. A serious shortage of newsprint more or less coincided with petitioner's expansion program. To assure itself of an adequate supply of newsprint during the shortage, petitioner joined with the Times-Mirror Company (Times-Mirror) [2] *215 and others in forming Publishers' Paper Company (Publishers), a corporation organized to acquire a paper manufacturing concern in Oregon. On March 15, 1948, petitioner acquired a 24.5 percent interest in Publishers, investing $980,000 which had been advanced by the L.D.S. Church in exchange for an unsecured demand note bearing interest at the rate of three percent per annum. Then in 1958 and 1959, net operating income declined substantially, due principally to a temporary reduction in petitioner's contractual distributive share of the agency's net income. [4] In both 1958 and 1959, interest accruing on petitioner's notes payable to the L.D.S. Church exceeded the net income realized on operations: Income From
Accrued
Operations (Net)
Interest
1958
$215,745.06
$397,765.61
1959
209,733.82
373,324.21
By the summer of 1959, however, there were reasonable expectations that Publishers would begin to pay substantial dividends in the coming year, and that in consequence petitioner's earnings posture would improve significantly. [5] Under these circumstances it was considered advisable that a portion of petitioner's notes payable to the L.D.S. Church be capitalized. *216 As of October 1, 1959, petitioner's books of account reflected the following amounts as being due to the L.D.S. Church: Outstanding notes payable
$12,996,177.20
Accrued Interest
2,242,955.83
Interest 1/1/59 - 9/30/59
298,324.21
Total
[6] $15,537,457.24
On October 1, 1959, capital stock of $5.5 million was issued to the L.D.S. Church for the following purposes: To extinguish notes payable
$2,996,177.20
To extinguish accrued interest
2,205,498.59
To charge interest expense
to date
298,324.21
Total
$5,500,000.00 With respect to the balance of the indebtedness, three notes were issued: Three percent note due 1/1/64
$2.5 million
Three percent note due 1/1/67
$2.5 million
Three percent note due 1/1/69 $5 million
Total $10 million As of December 31, 1959, these notes represented the whole of petitioner's long-term liabilities. Current liabilities totalled $317,558.34. By October 1, 1959, the shortage of newsprint which had occasioned petitioner's investment in Publishers had long since abated. Petitioner's retention of its Publishers shares was *217 no longer considered essential to its operations. The shares whose fair market value had by then reached $8,851,000 were therefore pledged to secure the $5 million note due January 1, 1969. [7]
In the years 1960 through 1963 petitioner realized net income [8] from operations and other sources [9] in the following amounts: Income from
Income from
Operations (Net)
Other Sources (Net)
1960
$362,267.56
$ 128,646.23
1961
265,430.02
95,649.79
1962
219,897.65
136,472.76
1963
625,827.69
139,596.61
Interest of $300,000 accrued on the notes payable to the L.D. *218 S. Church annually. When the first of the $2.5 million notes came due on January 1, 1964, it was cancelled and a new note in the same amount was issued. The new note provided that until payment was demanded, petitioner would pay on account of principal, no less than $1,000 on the last day of each month from January through May, 1964, and no less than $10,000 on the last day of each month commencing June, 1964, until the note was fully paid. Interest on all amounts outstanding was payable quarterly at the prime rate of Zions First National Bank on a 90-day loan. In 1964 and 1965 petitioner realized net income from operations and other sources in the following amounts: Income from
Income from
Operations (Net)
Other Sources (Net)
1964
$402,569
[ 38,560)
1965
584,912
110,906
Principal was paid and interest accrued on the notes payable to the L.D.S. Church in the following amounts: Principal Paid
Interest Accrued
$80,000
$336,398
120,000
331,425
On December 31, 1965, petitioner's long-term liabilities totalled $9,680,000, wholly owed to the L.D.S. Church. Current liabilities of $988,532 included $120,000 due to be paid on the *219 note issued January 1, 1964. In 1966 petitioner realized net income of $301,754 and $30,989 from operations and other sources, respectively. Interest of $348,369 accrued on the notes payable to the L.D.S. Church; and the outstanding balance on the note issued on January 1, 1964, was reduced by $110,000. On January 1, 1967, the second of the $2.5 million notes issued October 1, 1959, came due. It was cancelled and a ten-year note in the same amount was issued. This note provided that payments of no less than $10,000 be made on account of principal at the close of each month commencing with January, 1967, until the note was fully paid. Interest was payable quarterly at the prime rate charged by Zions National Bank on 90-day loans. As a result of this transaction, petitioner's longterm liabilities at the beginning of 1967 consisted principally of $9,440,000 owed to the L.D.S. Church, [10] while current liabilities of $1,052,817 included $240,000 coming due on the notes issued January 1, 1964 and 1967. In 1967, petitioner realized net income of $419,062 and $291,117 from operations *220 and other sources, respectively. Interest of $415,936 accrued on the notes payable to the L.D.S. Church. The outstanding balances on the notes issued on January 1, 1964 and 1967, were reduced by payments of $120,000 and $110,000, respectively. As of December 31, 1966, petitioner became obligated under the terms of its agreement with the Tribune, to bear approximately $1 million of the cost of procuring new equipment for the agency. This had the effect of reducing petitioner's cash when its management was contemplating improvements in its job printing plant. Faced with a need for greater liquidity, petitioner's management first thought to liquidate a part of petitioner's investment in Times-Mirror. This proposal was rejected. Instead, in August, 1967, petitioner's board of directors authorized its president and secretary-treasurer to negotiate a $1.75 million loan from Deseret Management Corporation (Management), an affiliate. On December 18, 1967, the loan was made. [11] In consideration of the loan, a note was executed by petitioner bearing interest at the rate of six percent per annum, and providing for payment of principal on December 18, 1972.[12] Petitioner also recommended *221 to the L.D.S. Church that the $5 million note due January 1, 1969, be capitalized so that petitioner would be relieved of the obligation to pay the interest accruing. This was done on December 20, 1967. In the years 1968 through 1972, payments of principal in the following amounts were made on the notes issued on January 1, 1964 and 1967: Principal Paid Note Issued 1/1/64 [13]
Note Issued 1/1/67 [14]
$130,000
$ 130,000
120,000
120,000
555,961
120,000
120,039
120,000
120,000
120,000
On March 2, 1973, respondent issued a statutory notice of deficiency in which deductions for interest on obligations owed to the L.D.S. Church were disallowed in respect of the years 1966 and 1967. OPINION A debt is an unqualified *222 obligation to pay a certain sum at an ascertainable time in the reasonably proximate future. Sayles Finishing Plants, Inc. v. United States,399 F.2d 214, 218 (Ct. Cl., 1968). Petitioner's notes made payable to the L.D.S. Church, which were outstanding in 1966 and 1967, clearly purport to represent such an obligation. We are to decide if the form of these instruments was consonant with the true relationship of the parties. The burden of proving this to have been so is on petitioner. In the main, the relationship of the parties is determined by their intentions. These are to be gleaned, not merely from the form in which the parties chose to cast their transaction, but from all the circumstances attendant upon it. McSorley's, Inc. v. United States,323 F.2d 900, 902 (10th Cir., 1963); Foresun, Inc.,41 T.C. 706 (1964), affd. 348 F.2d 1006 (6th Cir., 1965). In deciding if an instrument purporting to evidence a debt accurately *223 represents the relationship of the parties, a court typically will ask if at the time when the advances underlying the instrument were made, the corporate obligor reasonably could have been expected to comply with the terms of the instrument without unduly impairing its ability to continue in operation. Jack Daniel Distillery v. United States,379 F.2d 569, 583 (Ct. Cl., 1967); Tyler v. Tomlinson,414 F.2d 844, 847 (5th Cir., 1969); Burr Oaks Corp.,43 T.C. 635, 647 (1965), affd. 365 F.2d 24 (7th Cir., 1966). The court will then search the record for indications of subsequent changes of intention. Cuyuna Realty Company v. United States,382 F.2d 298, 301 (Ct. Cl., 1967). In this instance the underlying advances were made in the years 1948 through 1952; but the parties undertook to redefine their relationship substantially when petitioner was recapitalized on October 1, 1959. Because the notes outstanding in 1966 and 1967 derive from this event, it is appropriate that we begin by inquiring into the circumstances surrounding the recapitalization. Sabine Royalty Corporation,17 T.C. 1071, 1076-7 (1951); *224 Monon Railroad, 55 T.C. 345, 358 (1970).
From 1948 through 1952 petitioner incurred substantial operating deficits due to the expansion program which it inaugurated in 1947 and the competition in which it engaged with the Telegram. Then in 1952 circumstances changed markedly. The expansion program was concluded; the Telegram was absorbed; and petitioner reduced its operating expenses by joining in the formation of the agency. Thereafter petitioner's earnings posture improved considerably. By October 1, 1959, it was reasonable to assume that profits realized on operations, supplemented by income from other sources, would provide petitioner with funds sufficient to pay interest accruing on an obligation of $10 million at the rate of three percent annually. Subsequent events proved this to be the case. It would perhaps have been unduly sanguine to expect that from petitioner's earnings a fund could have been accumulated out of which the $10 million obligation could have been repaid comfortably in the reasonably proximate future. But by October 1, 1959, the shortage of newsprint which had occasioned petitioner's acquisition of its Publishers shares had abated. *225 The retention of these shares, the fair market value of which by then exceeded $8.8 million, [15] was no longer considered essential to petitioner's continued operations. These shares might have been used to discharge petitioner's obligations to the L.D.S. Church, a possibility recognized when the shares were pledged as security. Upon consideration of these facts we conclude that the terms of the notes issued by petitioner on its recapitalization must not have appeared unduly burdensome at that time. Moreover, by 1966 and 1967 petitioner's position had become no less favorable. Net income exceeded the interest accruing in favor of the L.D.S. Church almost consistently; and while petitioner's total liabilities remained fairly stable, its assets increased substantially in value. These facts tend to indicate that at all times relevant, the intentions of the parties were consistent with the terms of the instruments under consideration. BakerCommodities, Inc.,48 T.C. 374, 396-9 (1967), affd. 415 F.2d 519 (9th Cir., 1969). Strong evidence of the intentions of the parties is the record *226 of the obligor's payments on account of principal. Jack Daniel Distillery v. United States,supra, 583; Baker Commodities, Inc.,supra, 397. In this instance the portion of the debt evidenced by the $5 million note was capitalized on December 20, 1967, approximately one year before it became due. We must decide if the capitalization of the note represented a substantial change in the intentions of the parties or the mere recognition of a longstanding capital investment. The note was not capitalized because petitioner lacked the means to honor its terms. Rather the action was taken because this was the most convenient way of responding to a newly arisen business need. This being the case, the capitalization of the note does not support respondent's contention that the note had in fact represented an equity interest before it was capitalized formally. Given the fact that the note was at all times adequately secured, we think it fair to assume that until changing circumstances occasioned its capitalization, the parties to the note intended that petitioner comply with its terms. Utility Trailer Manufacturing Company v. United States,212 F. Supp. 773, 787-8 *227 (S.D.Cal., 1962). Turning our attention to the two notes of $2.5 million, we acknowledge that they were not paid in full when due. Rather extensions of both were granted. These were not, however, unreasonable extensions of a kind which bespeak the attitude of an investor in the purported creditor. See Charter Wire, Inc. v. United States,309 F.2d 878 (7th Cir., 1962), cert. denied 372 U.S. 965 (1963); Foresun, Inc.,supra.Rather the extension granted in each instance provided a schedule for the amortization of principal, requiring payments to begin in the month the extension was granted; and by the end of 1972, the combined balances outstanding on the two notes had been reduced by more than one-half. In this we perceive further evidence of a debtor-creditor relationship. Baker Commodities, Inc.,supra, 397; Green Bay Structural Steel, Inc.,53 T.C. 451, 457-458 (1969). Upon consideration of the entire record, we find petitioner to have sustained its burden of proof; and in conclusion we hold that petitioner's notes, payable to the L.D.S. Church and outstanding in 1966 and 1967, accurately represented the relationship *228 of the parties to those notes in the aforesaid years. Decision will be entered under Rule 155.
Footnotes
1. These deficits have been computed without reference to interest accruing on outstanding notes payable to the L.D.S. Church.↩
2. Times-Mirror published the Los Angeles Times.
On August 30, 1952, petitioner acquired the assets of its competitor, the Telegram, with $876,890 advanced by the L.D.S. Church in exchange for an unsecured demand note, bearing interest at the rate of three percent per annum. Thereafter, two newspapers were published in Salt Lake City: the Salt Lake Tribune(Tribune), published mornings and Sundays, and the Deseret News. To effect economies in operation, the publisher of the Tribune joined with petitioner in organizing a corporate agency (agency) to supervise, manage and perform all operations involved in printing and distributing their respective papers. The agency commenced operations on September 1, 1952. Due to the completion of the expansion program, the elimination of the Telegram, and the effectiveness of the agency in reducing costs; petitioner's operations began to prove profitable in 1953. In 1955, 1956 and 1957, net income Net income is computed without reference to interest accruing on notes payable to the L.D.S. Church.
[3] from operations exceeded interest accruing on petitioner's notes payable to the L.D.S. Church: ↩
Income From
Accrued
Operations (Net)
Interest
1953
$218,921.26
$398,303.80
1954
139,572.32
397,765.61
1955
523,163.95
397,765.61
1956
497,971.05
397,765.61
1957
505,378.06
397,765.61
4. The agency's net income was to be apportioned among its shareholders as follows: ↩
Deseret News
Salt Lake Tribune
1952-1957
50%
50%
1958-1962
40%
60%
1963-1967
45%
55%
1968 to date
50%
50%
5. From 1960 through 1964, petitioner received dividends from Publishers in the following amounts: 1960
$ 98,000
1961
156,800
1962
196,000
1963
235,200
1964
117,600 On February 12, 1965, petitioner exchanged its Publishers stock for shares in Times-Mirror.↩
6. This amount was reduced by a cash payment to $15.5 million.↩
7. In February 1965, petitioner's Publishers shares were exchanged for Times-Mirror stock whose fair market value was $13.5 million. The newly acquired Times-Mirror shares were then pledged to secure the $5 million note. In February, 1966, the Times-Mirror shares, whose fair market value had by then increased to nearly $20 million, were pledged to secure all of petitioner's notes payable to the L.D.S. Church.↩
8. Net income is computed without reference to interest accruing on the notes payable to the L.D.S. Church. ↩
9. Income from other sources includes dividends paid by Publishers.↩
10. Additionally there was a secured obligation of $161,522 payable to the Bennett Leasing Company.↩
11. Management procured the funds necessary to make the loan from the L.D.S. Church. ↩
12. nterest on the note was paid when due and principal was paid in full on or before December 31, 1972.↩
13. On December 31, 1972, the principal balance on this note was $1,024,000. ↩
14. On December 31, 1972, the principal balance on this note was $1,780,000.↩
15. George A. Nye,50 T.C. 203, 216↩ (1968).