**VARN, INC.**

**v.**

**The UNITED STATES.**

**No. 41–68.**

United States Court of Claims.

May 15, 1970.

William R. Frazier, Jacksonville, Fla., attorney of record, for plaintiff.

Norman J. Hoffman, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

OPINION

PER CURIAM:

This case was referred to Trial Commissioner Roald A. Hogenson with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on January 22, 1970. Defendant has filed no notice of exceptions, exceptions or brief, on this report and the time for so filing pursuant to the rules of the court has expired. On March 25, 1970, plaintiff filed a motion requesting that the court adopt the commissioner's opinion, findings of fact and recommended conclusion of law as the basis for its judgment in this case.

Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby grants plaintiff's motion and adopts the same as the basis for its judgment in this case without oral argument. Therefore, it is conclud-

1. *Cf.* Chain Belt Co. v. United States, 115 F.Supp. 701, 127 Ct.Cl. 38 (1953).

ed that plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined in further proceedings pursuant to Rule 131(c).

## OPINION OF COMMISSIONER

HOGENSON, Commissioner:

This is a suit to recover the sum of $42,364.67, the total amount of the deficiency assessments of federal income tax and interest paid by plaintiff to defendant for the taxable years 1961 through 1963. The issues presented involve the proper characterization of the agreements and circumstances involved in the cutting and disposal of timber on plaintiff's land, and the tax treatment (capital gain or ordinary income) to be accorded the proceeds derived by plaintiff from the transactions.

It is my opinion that plaintiff is entitled to recover under § 631(b) of the Internal Revenue Code of 1954, and that it is unnecessary to decide whether plaintiff's alternate theory of recovery is sustainable under §§ 1221 and 1231.

Throughout the taxable years in issue, and for more than 10 years prior thereto, plaintiff, Varn, Inc., a Georgia corporation, owned 37,000 acres of pine timberland in Brantley, Charlton and Ware Counties, Georgia. The timber cutting in this case occurred exclusively on such land.

The subject timber cutting was accomplished through arrangements made independently by Varn Timber Company, another Georgia corporation.

Also involved in this case are 3,500 acres of pine timberland in Camden County, Georgia, known as the Refuge Tract, which plaintiff acquired on November 1, 1959, and has owned ever since that time. None of the subject timber cutting occurred on the Refuge Tract, but such timberland is the subject matter of a pertinent agreement between plaintiff and Container Corporation of America, a Delaware corporation, operating a pulp mill at Fernandina Beach, Florida, in the vicinity of the subject timber cutting land.

Throughout the taxable years in issue, and prior thereto, plaintiff's purpose in owning and holding all of its timberlands was primarily, i. e., principally, of first importance, Malat v. Riddell, 383 U.S. 569, 572, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966), for the production of turpentine gum from standing trees on such land, and sale of such gum to a certain processing plant. Except for a relatively few trees removed in thinning practices usual in forest maintenance, or removed in the clear cutting of an area of worked out turpentine trees, containing some other trees, reasonably necessary for reforestation practiced, the trees cut in this case were those which had been belted out in the production of turpentine gum by the trade practice of gradually cutting off the bark over a period of years to the workable height of the tree trunks successively on two and sometimes three faces of each tree.

The pertinent processing plant was owned and operated by a partnership, the members of which were the shareholders of plaintiff corporation. Until about 1950, the partnership had owned and operated both the timberland and the processing plant. It was then that plaintiff corporation was organized, and thereafter owned and operated the timberland.

The enterprises of the partnership and plaintiff had been commenced by K. S. Varn and his older brother many years prior to 1950. In time, this partnership was owned by K. S. Varn individually and by Varn Turpentine & Cattle Co., another Georgia corporation, controlled by the family of Lester Varn, Sr., son of the older brother of K. S. Varn. Apparently K. S. Varn incorporated his share of the holdings of the partnership, at least to the extent of his interest in the timberland, at or prior to the organization of plaintiff corporation.

The stock of plaintiff corporation is and was owned 50 percent by K. S. Varn, Inc., another Georgia corporation,

controlled by the family of K. S. Varn; and 50 percent by Varn Turpentine & Cattle Co., previously mentioned.

Varn Timber Company is and was a corporation organized, owned and operated by two sons and a son-in-law of K. S. Varn, i. e., Jacob E. Varn, K. S. Varn, Jr., and Wayne D. Seaman, each of whom held 16⅔ percent of the stock; and by two sons of Lester Varn, Sr., i. e., George Varn and Lester Varn, Jr., each of whom held 25 percent of the stock.

As members of the respective Varn families, each stockholder of Varn Timber had some indirect interest in plaintiff, and also there were some common officers and directors of both companies. However, both Varn families left the management of plaintiff to K. S. Varn, and he had no interest in Varn Timber, and participated in no way in its organization, management or control. The organizers and owners of Varn Timber were mature men, and had started and engaged in the business of that company because of their need to supplement income received from plaintiff. While they were in different generations of the overall Varn family, they were generally within the same age grouping.

Varn Timber Company is and was a timber dealer, engaged primarily in acquiring rights to cut standing timber and in the sale of pulpwood derived therefrom. In some instances, it contracted to cut timber into pulpwood for a fee. Generally it purchased standing timber from timberland owners, usually under oral contracts, agreeing to pay the stumpage value in the current market of the standing trees; engaged private contractors, called producers, for a specified fee per cord to cut the standing trees into cords of pulpwood and deliver the same to a pulp mill; and received the going market price of the cords of pulpwood from the mill. This was the nature of the relationship between Varn Timber and plaintiff in the timber cutting involved in this case, except for the circumstances attendant to the Separate Agreement between plaintiff and Container Corporation, hereinafter related.

During the years 1954 through 1963, Varn Timber Company acquired rights to cut varying quantities of standing timber from plaintiff, but always much more in the aggregate from other timberland owners. During the years 1954–1958, and in terms of Varn Timber's total annual sales of pulpwood derived from all timber purchased, 2.9 to 5.8 percent of such sales were of pulpwood derived from timber on plaintiff's land, increasing to a range of from 16 to 17.4 percent in the years 1959–1963, those most relevant in this case.

On May 2, 1959, plaintiff acquired from Varn Turpentine & Cattle Co. a tract of land located near Albany, Georgia, for $210,000, paying $70,000 in cash, with the balance of $140,000 payable within 6 months thereafter. Plaintiff was desirous of exchanging such land for the 3,500-acre Refuge Tract, previously mentioned, which was then owned by Varn Turpentine & Cattle Co. The exchange was accomplished on November 1, 1959. In the meantime, plaintiff was in need of $140,000 to complete the transaction.

Sometime prior to November 1, 1959, Jacob Varn and George Varn of Varn Timber Company, who were also indirectly shareholders of plaintiff through their respective family corporations, conferred with K. S. Varn concerning the raising of $140,000 to complete the proposed exchange of lands. They admittedly had the dual purpose of aiding plaintiff to raise the needed funds and obtaining business for Varn Timber. Varn Timber had been providing pulpwood to Container Corporation, and was aware of the latter's practice of advancing interest-free loans to insure a source of supply of pulpwood. George Varn explained to K. S. Varn that plaintiff could obtain such a loan of $140,000 from Container Corporation, but that plaintiff would have to permit an acceleration of the cutting of its belted out timber to provide Container Corporation with sufficient pulpwood to repay the

loan. Mr. K. S. Varn had previously pursued a practice of restrictive cutting of timber, but agreed to negotiations with Container Corporation.

As above stated, Varn Timber had previously acquired and exercised rights to cut belted out timber on plaintiff's land, and in that connection had paid plaintiff the prevailing stumpage price for such timber. It was understood between K. S. Varn and Jacob and George Varn that Varn Timber would have the same right to cut belted out timber on plaintiff's 37,000 acres, and deliver pulpwood to Container Corporation on Varn Timber's account, with Varn Timber to pay plaintiff the going stumpage price of such timber, with Container Corporation to withhold sums of money sufficient to repay the $140,000 within a period of several years, and with Varn Timber to cut and deliver sufficient pulpwood to Container to repay Container's loan to plaintiff.

Thereupon Jacob Varn went to Container Corporation which committed itself to advance a $140,000 interest-free loan to plaintiff, which was accomplished on November 1, 1959, when plaintiff and Container Corporation entered into a Separate Agreement reciting the terms of the loan agreement. At the same time, plaintiff, having acquired the Refuge Tract on the same day, by Deed to Secure Debt conveyed the timber on the Refuge Tract to Container Corporation, and granted to Container the right to remove all of such timber, if plaintiff failed to perform the terms and conditions of the Separate Agreement, with the Deed to Secure Debt to become null and void and a reconveyance made by Container upon full performance by plaintiff of such terms and conditions. Both instruments were executed for plaintiff by K. S. Varn as its president.

The Separate Agreement between plaintiff and Container Corporation provided in pertinent parts that for the payment of $140,000 by Container to plaintiff, Container was to receive from plaintiff from timber on the Refuge Tract not less than 18,373 cords of pine pulpwood or to recover in pine pulpwood at the stumpage price not less than the sum of $140,000 by November 1, 1964, whichever would yield to Container the greater quantity of pine pulpwood.

The stumpage price was defined as 48.4 percent of the prevailing price per cord of pine pulpwood. Container was required to credit plaintiff on its books and provide plaintiff with a weekly statement of the number of cords received and the stumpage price thereon. It was stated that when the aggregate of such credits equaled $140,000, and when the aggregate number of cords received equaled 18,373, then all rights of Container under the Separate Agreement and Deed to Secure Debt would terminate.

If and when the credits aggregated $140,000, but less than 18,373 cords had been received by Container, Container was entitled to continue to receive cords up to 18,373, and Container was to pay in cash the agreed stumpage price for such additional cords.

Plaintiff had the right under the Separate Agreement to cut and deliver to Container pulpwood from any lands other than the Refuge Tract, and Container was required to credit plaintiff for such pulpwood on the same terms as provided with respect to the Refuge Tract, except for freight adjustment provisions irrelevant herein.

As previously stated, all of the timber cutting in this case was on plaintiff's 37,000 acres of timberland, and none on the Refuge Tract.

As the facts concerning actual performance of the Separate Agreement demonstrate, the following provision of such agreement is of major significance in this case:

5. Varn [plaintiff] shall have the privilege of selecting an independent contractor or wood producer to cut and ship to Container all pulpwood hereunder for which Container shall pay the current mill price in cash, weekly, as customary in the trade, less

stumpage, if any. Such mill price shall be the price for truck wood delivered from areas having a comparable freight or trucking or transportation rate, but in no event less than the price then currently being paid to Varn Timber Company for equivalent wood. Such stumpage deducted from the mill price shall be 48.4% of the mill price and shall be credited in the manner provided in paragraph 4 until the aggregate amount of such credits shall equal the amount advanced by Container to Varn and secured by said Deed to Secure Debt; but when the aggregate amount of such credits shall equal the amount so advanced and secured, then no further deductions for stumpage shall be made, but Container shall pay the full current mill price in cash. Operating under this paragraph, Varn shall deliver or cause to be delivered to Container on Container's requisitions not less than an average of 3675 cords of pine pulpwood per year, unless such delivery be rendered impossible by bad weather, high water, strikes, unavailability of transportation or other similar causes clearly beyond the control of the producer. In event of continued or repeated failure of Varn's producer to comply with the above delivery schedule, Container shall have the right in its absolute discretion to dispense with the services of Varn's wood producer under this paragraph.

It is noted that Varn Timber Company was specifically mentioned in the foregoing provisions, and consistent with previous separate dealings between Varn Timber and each of the parties to the Separate Agreement, it is reasonbly to be inferred (both from the terms of the provisions and from the consistent practice of the parties thereafter) that both plaintiff and Container Corporation expected that Varn Timber would be the independent contractor which would perform under the terms of the above-quoted provisions, and that Varn Timber would receive the going mill price per cord of pulpwood from Container and

pay the stumpage price of timber to plaintiff, except to the extent that the stumpage price portion of the pulpwood price would be retained by Container and credited to plaintiff until Container had recouped its $140,000 advance to plaintiff.

It was further provided in the Separate Agreement between plaintiff and Container Corporation that plaintiff, or its wood producer, were privileged, but not bound, to ship to Container a maximum of 8,000 cords of pulpwood each year.

It is of substantial importance that the Separate Agreement and Deed to Secure Debt did not provide for conveyance by plaintiff to Container of timber, or even timber cutting rights, on any land other than the Refuge Tract. In the event of default by plaintiff of performance of the agreement, Container could enter upon the Refuge Tract and cut and remove timber, but no such right was acquired by Container with respect to any other land. Thus, insofar as the Separate Agreement and Deed to Secure Debt were concerned, plaintiff retained full title to the timber and timber cutting rights on its 37,000-acre timberland, and Container acquired none of such rights or title.

In fact, defendant has conceded in this case that plaintiff retained an economic interest in the timber located on its 37,000-acre timberland.

Plaintiff entered into an oral agreement with Varn Timber Company, as an independent contractor, in accordance with its previous dealings with that company. By such agreement, Varn Timber acquired the right to cut all belted out timber on plaintiff's 37,000-acre timberland, with the understanding that Varn Timber would arrange for and control the cutting of such timber, cause the delivery of sufficient cords of pulpwood to Container to satisfy the terms and conditions of the Separate Agreement between plaintiff and Container, and pay to plaintiff the going stumpage price for such timber except to the extent plaintiff otherwise received

such stumpage price by credits to its account with Container. The informality of such agreement, implied in part from the conduct of the parties, has no adverse effect upon plaintiff's right to recover under § 631(b) of the Internal Revenue Code of 1954. Barclay v. United States, 333 F.2d 847, 854–855, 166 Ct.Cl. 421, 432–434 (1964).

The informal agreement between plaintiff and Varn Timber is consistent with the above-quoted provisions of paragraph 5 of the Separate Agreement between plaintiff and Container, pursuant to which provisions, performance of plaintiff's obligations to Container was accomplished. Such provisions must have been made in contemplation of acquisition by Varn Timber of the cutting rights to the belted out timber on plaintiff's 37,000-acre timberland. It cannot reasonably be concluded that plaintiff had agreed to sell or sold pulpwood to Container, which had to be derived from timber on such land, as Container acquired no interest in such timber and had no right to insist that the pulpwood be derived from that source. It is clear that plaintiff sold timber cutting rights to the belted out timber on such land to Varn Timber, with part of the consideration being that Varn Timber would deliver pulpwood to Container in fulfillment of plaintiff's obligations under its Separate Agreement with Container. Plaintiff neither cut nor reserved the right to cut the timber involved herein. In these and other respects, subject case is clearly distinguishable from Ray v. Commissioner, 32 T.C. 1244 (1959), aff'd per curiam, 283 F.2d 337 (5th Cir. 1960), heavily relied upon by defendant.

Throughout the 5-year period involved in the Separate Agreement between plaintiff and Container, Varn Timber consistently supplied more pulpwood to Container from its timber cutting on subject land, than the amounts required by the terms of such agreement. At the request of K. S. Varn, Container retained the stumpage price on more than the required volume of 3,675 cords of pulpwood per year, resulting in repayment of the $140,000 loan in advance of the end of the 5-year period. Obviously Varn Timber had no reason to object. Throughout the entire period, Varn Timber caused even greater quantities of pulpwood, derived from its cutting operations on subject timberland, to be delivered to Container. On such greater quantities, Container retained nothing, but paid to Varn Timber the entire mill price of such pulpwood, and Varn Timber in turn paid to plaintiff the stumpage price of the timber involved. Thus, in the overall transaction, Container accounted to Varn Timber for and paid to the latter the mill price of the pulpwood delivered, deducting the stumpage price of the timber on certain volumes of pulpwood, and applying credits therefor to plaintiff's loan account, but on further deliveries of pulpwood, accounted to Varn Timber for and paid to the latter the full mill price of such pulpwood, leaving to Varn Timber full responsibility for accounting to plaintiff for the stumpage price on the excess deliveries of pulpwood.

Varn Timber in effect accounted to plaintiff for all of the stumpage price of timber cut from subject land, either by way of the credits entered by Container on plaintiff's loan account, or by direct payments to plaintiff of the stumpage price of the timber involved in the excess deliveries of pulpwood by Varn Timber to Container.

Plaintiff's proceeds from the three-party transactions, which proceeds are the subject matter of the capital gain or ordinary income treatment to be applied in this case, consisted entirely of the stumpage price of the timber involved.

It is concluded that all of the elements essential to plaintiff's entitlement to long-term capital gain treatment under § 631(b) on its proceeds from the overall transaction were present in this case: (1) Plaintiff was the owner of the pertinent timber; (2) plaintiff disposed of the timber under contractual arrangement with Varn Timber Company, by which plaintiff retained an economic interest in such timber; and (3) plaintiff

had held such timber for more than 6 months prior to its disposal. Barclay v. United States, *supra*, 333 F.2d at 852, 166 Ct.Cl. at 428.

Defendant's position is that plaintiff's entitlement to capital gain treatment is limited to § 631(a), and that since it is conceded by plaintiff that it did not make the election required under that subsection, and since the provisions of subsections (a) and (b) of § 631 are mutually exclusive, Ray v. Commissioner *supra*, 32 T.C. at 1250, plaintiff cannot recover under § 631(b). Defendant concedes that § 631(a) is applicable only if the cutting of the pertinent timber was done by plaintiff, and strains for ultimate findings that plaintiff was cutting its own timber, that plaintiff had simply a fee arrangement with Varn Timber Company to cut the timber, and that plaintiff was simply selling pulpwood to Container from the timber cut by Varn Timber.

The fact remains that Container's right to receive pulpwood was limited to the timber on the Refuge Tract, none of which was involved in this case, and plaintiff was left free to dispose of its timber on its 37,000-acre timberland in any manner it desired. In fact, it disposed of the belted out timber on such land by agreement with Varn Timber Company, not merely for a timber-cutting fee, but with the understanding that Varn Timber would pay plaintiff the going stumpage price of such timber, that Varn Timber would arrange for the cutting of such timber at its own cost, and that Varn Timber would receive the going mill price for the pulpwood derived from such timber, assuming the risk that it would have a profit after payment of the stumpage price and its costs of cutting and delivery of the pulpwood to the mill.

It is only incidental that Varn Timber was required by plaintiff to deliver pulpwood to Container at the going mill price, not all of the pulpwood cut, but sufficient quantities to fulfill the terms and conditions of the Separate Agreement between plaintiff and Container Corporation. It is significant that plaintiff never received more than the stumpage price of the timber, whether in the form of credits to its account with Container, or by way of direct payment from Varn Timber, and that Varn Timber received the mill price of the pulpwood, even though on some of the pulpwood, Container retained the stumpage price, which Varn Timber would otherwise have had to pay to plaintiff.

The circumstances attendant to the Separate Agreement between plaintiff and Container Corporation do not alter the facts that plaintiff was not cutting its own timber, did dispose of its belted out timber on the 37,000-acre timberland, retaining an economic interest therein, and was the owner of such timber for the requisite period of time prior to disposal. Since plaintiff was not cutting its own timber, § 631(a) is not applicable, and plaintiff had no reason to make the election called for in that subsection.

From the timber cutting involved in this case, plaintiff received only those proceeds which it was able to command as the owner of the standing timber, and nothing from the cutting of the timber or delivery of the resulting pulpwood to Container. For the proceeds received by it, plaintiff is entitled to long-term capital gain treatment under § 631(b).