Pee Curiam :
These cases come before the court on plaintiff’s exceptions to a recommended decision filed April 6, 1972, by Trial Commissioner Roald A. Hogenson pursuant to Rule 184(h). The court has considered the case on the briefs and oral argument of counsel. Since the court agrees with the decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is not entitled to recover on its claims and defendant is not entitled to recover on its counterclaim. Accordingly, plaintiff’s petitions and defendant’s counterclaim are dismissed.
OPINION OF COMMISSIONER
Hogenson, Commissioner: Plaintiff, a Georgia corporation, has for many years been the owner in fee of more than 200,000 acres of land comprising the Suwannee Forest, located in Clinch and Echols Counties, Georgia, about 70 miles from Jacksonville, Florida.
Plaintiff seeks in these consolidated cases to recover judgment in the sum of $298,355 for refund of Federal income tax and assessed interest paid by plaintiff to defendant for calendar years 1965, 1966, and 1967, together with interest as provided by law. Determination of the amounts of recovery, if any, has been reserved until decision of the issues of liability.
Such issues involve the proper characterization of a 1947 agreement, as amended, between plaintiff and St. Regis Paper Company, pursuant to which St. Regis acquired the rights to timber growing or to be grown and took possession and management of the Suwannee Forest for a 60-year term commencing January 1, 1948. The issues relate to the tax treatment (long-term capital .gain or ordinary income) to be accorded to the proceeds derived by plaintiff from such agreement during the taxable years in dispute.
Plaintiff relies on § 631 (b) of the Internal Revenue Code of 1954, and in the alternative on §§ 1221 and 1231, as entitling it to long-term capital gain treatment.
*458 After a full review of tbe record and upon consideration of tbe requested findings of fact and briefs of tbe parties, it is my opinion based upon tbe following detailed and ultimate findings of fact and conclusions of law, that plaintiff is not entitled to recover, that its petitions should be dismissed, and that defendant’s counterclaim should be dismissed.
FINDINGS op Fact
1. Plaintiff, Superior Pine Products Company, is and was a Georgia corporation, with principal office at Fargo, Georgia.
2. Plaintiff, pursuant to extensions granted, on or about June 10, 1966, filed its Federal income tax return for calendar year 1965 with tbe District Director of Internal Revenue, Atlanta, Georgia. Plaintiff paid the income tax as shown thereon in the sum of $115,499.42.
3. Under date of October 28, 1966, plaintiff executed Treasury Form 870, Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Over-assessment, agreeing to pay the deficiency stated therein for the year 1965. The deficiency was in part a result of a determination by the defendant’s agent that a portion of plaintiff’s reported receipts from a certain agreement with St. Regis Paper Company constituted ordinary income and not capital gain income as reported. The adjustments resulted in the assertion of a deficiency in income tax for the year 1965 in the amount of $95,157.07.
4. On January 6, 1967, plaintiff paid to the District Director of Internal Revenue, Atlanta, Georgia, the amount of $95,757.07, in payment of the asserted deficiency in income tax for the year 1965, plus interest thereon, computed to the date of payment, in the amount of $4,122.80.
5. On its Federal income tax return for 196.5, plaintiff reported all of its income from the St. Regis agreement in the sum of $477,701.01 as proceeds from the sale of timber, deducted $17,374 as expense of sale, and treated the balance of $460,327 as a long-term capital gain. Plaintiff included as a direct expense of sale of timber $15,246 of the total compensation paid to its officers in the sum of $24,180 for 1965.
*459 Year 1965 was tbe subject of an audit by the Internal Revenue Service, which determined that of the $417,701.01, $38,942.44 represented capital gain income and the balance, $438,758.57, represented ordinary income. This resulted from application of Rev. Rui. 62-81, 1962-1 Cum. Burl. 153, and the determination that the timber on plaintiff’s land, subject matter of plaintiff’s agreement with St. Regis, had a fair market value of $7,300,000 as of January 1, 1948, the commencement date of the term of such agreement.
By the end of 1965, plaintiff had received $7,738,758.57 under its agreement with St. Regis, or $438,758.57 more than the fair market value of timber on the tract at January 1, 1948.
6. Plaintiff, pursuant to extensions granted, filed its Federal income tax return for calendar year 1966 on or about June 16, 1967, with the District Director of Internal Revenue, Atlanta, Georgia. Plaintiff paid the income tax as shown thereon in the sum of $212,230.81.
7. On its Federal income tax return for 1966, plaintiff reported its income from the St. Regis agreement in the sum of $486,419.90 as ordinary income instead of capital gain income as reported on its returns for prior years.
Plaintiff deducted from ordinary income all of the $24,900 paid to its officers in 1966.
8. On or about November 28,1967, plaintiff filed Treasury Forms 843, Claims for Refund, for the years 1965 and 1966, requesting refunds in the respective amounts of $97,668.34 and $98,913.70, plus interest and such other and greater amount as may be legally refundable. Each of such claims asserted that plaintiff was entitled to capital gain income treatment on all of its proceeds from the St. Regis agreement.
9. Each of the claims for refund for years 1965 and 1966 was disallowed by defendant, and on September 18, 1968, plaintiff executed Treasury Form 2297, Waiver of Statutory Notification of Claim Disallowance, covering both of such years.
10. Plaintiff timely filed its Federal income tax return for calendar year 1967 with the Southeast Regional Service Center, Internal Revenue Service, Chamblee, Georgia, and *460 paid the tax shown to be due thereon in the sum of $112,657.45.
Plaintiff reported its income from the St. Begis agreement in 1967 in the sum of $467,703.32 as proceeds from sale of timber, deducted $23,670.92 as expense of sale of timber, and treated the balance of $444,032.40 as long-term capital gain. Plaintiff included as a direct expense of sale of timber $16,254 of the total compensation paid to its officers in the sum of $25,300 in 1967.
11. Under date of September 18, 1968, plaintiff executed Treasury Form 870, Waiver of Bestrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Over-assessment, agreeing to pay the deficiency stated therein for the year 1967. This deficiency was in part the result of a determination by the Internal Bevenue agent that a portion of plaintiff’s receipts from the St. Begis agreement constituted ordinary income and not capital gain as reported. The additional taxes alleged to be due and owing amounted to $98,695.69.
12. On December 19, 1968, plaintiff paid to the District Director of Internal Bevenue, Atlanta, Georgia, the sum of $98,695.69 in payment of the deficiency in income tax determined for the year 1967, plus interest computed to the date of payment in the amount of $3,535.47.
13. On or about June 3, 1969, plaintiff filed Treasury Form 843, Claim for Befund, for the year 1967, in the sum of $98,237.36, plus interest and such other and greater amount as may be legally refundable. That claim alleged that the dis-allowance of the capital gain treatment on the proceeds received by plaintiff pursuant to the St. Begis contract was erroneous.
14. The claim for refund for the year 1967 was disallowed by defendant, and on October 7, 1969, plaintiff executed Treasury Form 2297, Waiver of Statutory Notification of Claim Disallowance, covering that year.
15. On August 27, 1947, plaintiff and the St. Begis Paper Company entered into the written agreement, entitled Indenture, pursuant to which plaintiff received the income ($477,701.01 in 1965, $486,419.90 in 1966, and $467,703.32 in 1967), the tax treatment of which is in dispute in this case.
*461 Th.rough.out its provisions, plaintiff is referred to as the “Seller” and St. Eegis as the “Purchaser.”
16. Such agreement provides that plaintiff agrees to sell to St. Eegis and St. Eegis agrees to buy from plaintiff during the term beginning January 1, 1948, and ending December 31, 2007, all timber and timber rights, growing and to be grown, on plaintiff’s timberlands containing 208,000 acres, more or less, located in Clinch and Echols Counties, Georgia. This area is and has been known as the Suwannee Forest.
17. By such agreement, St. Eegis obtained all surface rights needed in the development of the subject land, including logging privileges, right of ingress and egress for its agents and employees, and the right to build and operate railroads, dirt roads, canals, and other facilities for the purpose of removing timber and timber products and for the purpose of transporting timber, timber products, supplies, equipment, and employees over or across the land.
St. Eegis also acquired the right to use, occupy and maintain all buildings and structures on such land, and the right to construct and use additional buildings, structures, roads and bridges, all as necessary and convenient for its operations on the land.
18. Plaintiff by such agreement reserved the oil, gas and mineral rights upon and beneath the land, and the right to explore for, mine, drill, produce and remove oil, gas or minerals.
The agreement provides that the rights and obligations of the parties are subject to two oil and gas leases covering all of the land; all turpentine leases covering and not exceeding 80 crops of 10,000 cups each, expiring not later than December 31,1947; all bee agreements, expiring December 31, 1948; and all existing easements for roads, ditches, water rights, and public utilities.
St. Eegis agreed to purchase all turpentine cups and gutters owned by plaintiff on January 1, 1948, at their book value on that date.
19. Plaintiff and St. Eegis expressly agreed in such contract that under normal conditions and with good forestry practice, the acreage involved would have an average annual growth or reproduction of at least 150,000 cords of timber.
*462 St. Eegis agreed to pay each calendar year, in equal quarterly installments on the first day of each quarter, a sum equal to the prescribed price for 160,000 cords of pulpwood or its equivalent. The initial price was set at $2 per cord, but provision was made for variation in such price in accordance with change in the average of wholesale commodity prices for all commodities generally, except that in no event was plaintiff to receive less than $150,000 per year. For saw-timber, crossties, poles or pilings, and turpentine crops, utilized or removed by St. Eegis, the contract specified factors for conversion into cords.
20. By subject contract, St. Eegis acquired the right to cut and remove or utilize the average annual growth or reproduction of timber on the land. If such average annual growth becomes less than the 150,000 cords initially agreed, St. Eegis is nevertheless obligated to pay on the basis of 150,000 cords. If such average annual growth becomes greater than 150,000 cords, St. Eegis not only has the right to cut the entire average annual growth, but also is obligated to pay at the prevailing contract price per cord for all of such average annual growth, whether the same is cut, removed or otherwise utilized or not.
The contract provides for arbitration proceedings to settle any dispute between the parties as to average annual rate of growth of timber.
21. The contract contains what is commonly known in the industry as a backlog provision. In the event St. Eegis fails to remove in a particular year all of the timber for which payment is required, St. Eegis has the right to cut, remove or otherwise utilize the deficiency which happened in that year (the backlog) during the next 12 years. However, before St. Eegis may cut any backlog, it must make the allowable cut for the current year.
If within 12 years after the year with respect to which timber is paid for, St. Eegis does not cut, remove or otherwise utilize the backlog for that year, then the right of St. Eegis to cut the timber so paid for terminates, and the ex *463 cess payment for that year is retained by plaintiff as liquidated damages for the failure of St. Regis in that respect.
22. St. Regis obligated itself, at its own expense and throughout the term of the agreement, to manage and operate the land and the timber thereon in accordance with good forestry practice, to restock cut or burned areas, and to provide fire protection as good forestry practice requires, in such manner that the average annual growth or reproduction would not be less than the amount of timber cut and removed or otherwise utilized annually.
St. Regis was entitled to utilize in its logging operations the following methods: (a) selective cutting, the cutting and removal of not more than 50 percent of the dominant and co-dominant stems; ('b) seed tree plan, cutting and removal of substantially all of the growth except five seed trees per acre; and (c) clear cutting, cutting and removal of all merchantable timber growth.
St. Regis was required to restock or plant any areas clear cut, or areas substantially damaged by fire as to leave less than five seed trees per acre, or areas not naturally restocked under the seed tree plan, planting not less than 400 trees per acre.
23. In the event of a fire between April 1st and November 30th of any year to the extent of 500 acres, or more, then during the succeeding 10 years, the amount of timber St. Regis may cut is reduced by 1 cord per acre of the land burned, or if salvage of merchantable timber is performed, % cord per acre burned, but St. Regis’ obligation to make payments is not reduced below the contract price per cord for 150,000 cords.
24. St. Regis is required to pay all costs of the operation and management of the land and timber thereon, including fire protection, all severance taxes, and all ad valorem taxes.
25. St. Regis reserved the right to terminate the agreement at the end of each of the 20th through the 24th years of the 60-year term, by giving written notice to plaintiff at least 12 months prior to the date of such termination.
*464 26. In the event of default by St. Regis witb respect to any of its obligations under the agreement, plaintiff reserved the right to terminate the agreement; or to terminate the right of St. Regis to cut timber, take possession of the land, improvements and timber, and sell, lease or otherwise dispose of the timber and timber rights, with the proceeds to be applied first to plaintiff’s expenses incurred, then to the obligations of St. Regis accrued or to accrue during the 60-year term of the agreement, with St. Regis to remain liable for any deficiency; or to treat such default as a repudiation of the agreement, with St. Regis to remain liable for the difference between the purchase price for the full term of the agreement and the fair market value at the time of default of the remaining timber and timber rights.
27. The agreement recites that the title to timber passes from plaintiff to St. Regis when and only when such timber is severed from the land.
28. The contract is binding upon the successors and assigns of the parties. Neither party can make an assignment without the consent of the other except that either party may assign its rights without consent and without being relieved of its obligations and liabilities to a corporation of which it owns more than 50 percent of the voting stock. In addition, St. Regis was reserved the right to assign the agreement without plaintiff’s consent to a corporation with total assets of at least $10 million, paid-in capital of at least $3.4 million, a capital working fund of at least $1 million, which corporation has binding commitments for prompt construction or acquisition of a wood pulp mill or a wood pulp and paper mill, having an installed daily capacity of at least 150 tons, located within 175 miles of subject land.
29. Plaintiff agreed that it would not sell (or lease, mortgage or encumber) the land to any third party except during a 12-month period following the expiration of a 60-day option by which plaintiff would offer the land to St. Regis for a definite price and upon express terms. If St. Regis failed to exercise the option, plaintiff had the 12-month period during which it could accomplish a sale to any third party on the *465 same terms as tbe option at the same or greater price. No such sale baying been made within 12 months, plaintiff was required to repeat the same process before it could make a later sale to a third party.
30. The contract further provides that should either party be unable to perform any of its obligations by reason of war, acts of the public enemy, labor strikes on the part of St. Eegis employees, government restrictions, condemnation proceedings, exploration for or exploitation of oil, gas or minerals, then contract payments would be reduced in the same proportion and for the same length of time as timber cutting was reduced by such events or casualties.
31. By express provision, the contract is to be construed under the laws of Georgia.
32. On December 31, 2007, or upon an earlier termination of the contract, all rights of St. Eegis will terminate.
33. Subject agreement is the same contract as that involved in the case entitled Superior Pine Products Co. v. Williams, 214 Ga. 485, 106 S.E. 2d 6 (1958).
34. Subject agreement was amended by Supplemental Indenture executed by the parties on December 31,1956. With respect to the obligations of St. Eegis to pay annually all ad valorem and severance taxes assessed against the land and the timber and improvements thereon, as agreed in the original contract, it was recited in the Supplemental Indenture that in accordance with the original intentions and understandings of the parties, such taxes were the annual rental for the use and occupancy by St. Eegis of all of plaintiff’s buildings and structures on the land, and that St. Eegis had the right to rent the same to third parties.
The tax years involved in the case cited in finding 33 above were 1952 and 1953, and the December 31,1956, amendment of subject agrément was not a part of the record in that case.
35. Subject agreement was also amended by Supplemental Indenture executed by the parties on December 23,1963, by which the parties agreed that St. Eegis’ right to cut and remove uncut timber which was paid for during the years of 1950, 1951, and 1952, was extended until December 31,1976, with St. Eegis to pay to plaintiff $1 for each cord of pulp *466 wood so recovered out of the backlog, such payment to be made on the first day of January, April, July, or October, next succeeding the date of the cutting and removal.
36. The sums reported by plaintiff as income from the St. Regis contract for the tax years in dispute ($477,701.01 for 1965, $486,419.90 for 1966, and $467,703.32 for 1967) were comprised of quarterly prepayments at the prevailing contract prices ($3.0093 per cord for 1965, $3.1062 for 1966, and $3.1180 for 1967) computed on the basis of 150,000 cords of timber for each year, plus backlog cut in 1965 and 1966 at the rate of $1 per cord.
The number of cords cut by St. Regis amounted to 176,306.01 for 1965, 170,508.22 for 1966, and 131,107.35 for 1967. Thus, the backlog cut in 1965 and 1966 amounted respectively to 26,306.01 and 20,508.22 cords.
37. From the inception of the contract until the tax years in dispute, plaintiff treated in its successive Federal income tax returns all of its receipts from the St. Regis indenture as long-term capital gains, and this method of reporting was accepted by the Internal Revenue Service for such years.
38. The lands included in the St. Regis agreement were purchased by plaintiff some 20 years prior to the making of that contract on August 27, 1947, and have been continuously owned by plaintiff since their acquisition. They have largely consisted of timbered areas, and at the time of the execution of subject contract had substantial amounts of growing timber.
While the St. Regis agreement recited that subject land contained 208,000 acres, more or less, the actual acreage probably exceeded that amount, as subsequent surveying estimates contained in reports prepared by or for St. Regis indicated that such land amounted to 220,000 acres as reported in 1950, or to 215,540 acres as reported in 1954.
The fair market value of the timber on such land as of January 1, 1948, the date of commencement of the term of subject contract, was $7,300,000.
39. Plaintiff received the following sums per year from St. Regis pursuant to the express provisions of the agree *467 ment for payments for timber and timber rights, growing or to be grown, on subject land:
Year Amount
1948 _ $387,330. 00
1949 _ 369,405.00
1950 _ 382,920. 00
1951_ 423,884.47
1952 _ 413, 835. 00
1958 _ 408,285. 00
1954 _ 409, 020. 00
1955 _ 410,490. 00
1956 _ 423, 855.00
1957 _ 436, 095.00
1958 _ 442, 020. 00
1959 _ 443,145. 00
1960 _ 443, 505.00
1961_ 441, 660.00
1962 _ 443,145.00
1963 _ 479,226.08
1964 _ 492,184.90
1965 _ 477, 701.01
1966 _ 486, 873.22
1967 _ 467,250. 00
1968 _ 478, 710.00
1969 _ 478,710. 00
40. The computations of cordage cut on subject land for the years 1948 through 1969, and the allocation by St. Eegis between types of operations, are as set forth in the schedule included in these findings of fact, entitled “Cordage Cut on Subject Land by St. Eegis during the Years 1948 through 1969.”
41. Plaintiff was incorporated on November 19, 1925, as a subsidiary of Paper Maters Chemical Corporation, and in late 1925 plaintiff acquired the land covered by the St. Eegis agreement. Its balance sheet as of January 1,1926, disclosed fixed assets at $1,459,677, comprised of buildings and equipment at $94,475, land at $253,517, and timber and turpentine rights at $1,111,685.
The parent company, engaged in the chemical manufacturing business, was a large producer of rosin size for supply to the papermaking industry. Since rosin was derived from naval stores (turpentine gum) produced from pine trees,

*468

*469 and since Paper Makers wanted to control to some extent its source of supply of rosin, it organized plaintiff as a subsidiary company to acquire, own and operate the timber-lands involved in this case for production of naval stores.
42. In 1926, plaintiff’s first forest manager made the rounds of various forestry schools, looking for qualified personnel to cruise subject timberlands, and also to find an assistant. He selected Mr. William Oettmeier, an honor graduate of the Forestry School of Pennsylvania State University, who commenced serving as plaintiff’s assistant forest manager on April 1,1926. In 1932, Mr. Oettmeier became plaintiff’s forest manager, and in late 1946 or early 1947, became plaintiff’s president. During the 1926-1947 period, plaintiff engaged in forestry practices to increase the volume and quality of timber on subject land.
43. From 1926 to 1930, plaintiff engaged directly in the production of naval stores on subject timberlands employing a naval stores manager and labor force for such operations. Plaintiff shipped most of the rosin derived from the turpentine gum to various plants of Paper Makers, but sold the turpentine on the open market. During that time, plaintiff had 20 to 25 crops of turpentine trees in production, a crop consisting of 10,000 trees, and also operated a sawmill. Plaintiff’s management plan was to practice reforestation and gradually build up naval stores production to 250 crops.
By 1938, naval stores operations (conducted by lessees after 193,0) amounted to 108 or 109 crops on subject land. However, the naval stores business then began a general decline due to the introduction of less expensive substitutes for turpentine and labor shortages, and by 1947, naval stores operations on subject land consisted of about 69 crops. Such operations continued into the term of the St. Regis agreement, as shown by the schedule mentioned in finding 40 above.
44. In 1930, Plercules Powder Company acquired Paper Makers Chemical Corporation, except that at the instance of Hercules plaintiff was not included in the transaction. Prior to the acquisition, the shares in plaintiff were distributed to the stockholders of Paper Makers, and plaintiff then became an independent company.
*470 45. After 1930 and through. 1947, plaintiff did not directly conduct the naval stores production, but leased such operations on its land to others, with the terms of the leases in later years providing for plaintiff to furnish the required cups, gutters and nails, for the lessee to do all of the work, and for plaintiff to receive 25 percent of the proceeds of sales of crude gum to a processing plant.
46. After the commencement by plaintiff of the leasing to others of naval stores production, plaintiff continued its reforestation program, and its principal direct activity then became the growing of trees and management of the forest, including fire protection on subject land. In addition plaintiff for some time had a wood products operation by which it produced some poles and pilings for sale to others on a stmnpage basis.
After 1932, plaintiff did for a while operate a sawmill. Tree-length logs were cut into conduit blocks and lumber, which were sold to others. Plaintiff had about 30 men performing logging in the forest, some of whom were plaintiff’s employees, with the others employed under contracts with plaintiff. Seven men were employed by plaintiff in the mill.
Prior to World War II, plaintiff sold only a few carloads of pulpwood, but during the war such sales increased somewhat.
Plaintiff continued to sell standing timber to others for the production of lumber, poles, crossties, fence posts, pulpwood and other forest products. Such sales in 1942,1943 and 1944 amounted respectively to $56,183, $55,077, and $50,654; and for 1946 and 1947, respectively to $62,516 and $76,942. Plaintiff sold on a stumpage basis 2,311,070 and 5,903,744 board feet of timber respectively in 1946 and 1947.
In its various activities involving use or disposal of timber on subject land, aside from naval stores operations, plaintiff cut or sold trees which were in the main those which had been worked out in the naval stores operations, i.e., those defaced to the workable heights of the trunks by cutting and use of nails in the placement of cups and gutters in the gum production procedures, and in addition other trees removed in the thinning of timber stands in plaintiff’s reforestation program.
*471 The defacement of the tree trunks in naval stores operations and presence of nails substantially reduced the pulpwood and timber value of such trees and slowed their growth. The economic course was to remove worked-out trees and replace them with others.
47. Prior to 1948, the most valuable product of subject land was naval stores, which was plaintiff’s major source of income.
At a stockholders meeting on March 21, 1945, plaintiff’s president advised that if the problem of insufficient and inefficient labor could be solved, naval stores production by plaintiff would be steadily increased, as plaintiff had sufficient timber available for three times the present rate of naval stores production. He further advised that production of pine lumber and other wood products was limited by the amount of timber that had been worked-out for naval stores, and that it would be a long time before any increase in naval stores production would be reflected in increased logging operations. He noted the exceptions that pulpwood could be produced from trees cut in thinning operations, and that such items as fence posts and fuel wood could be produced from a limited amount of timber not suitable for naval stores production.
Plaintiff’s president also advised the stockholders that much of plaintiff’s timber was in need of thinning to avoid stagnation of the forest, that such thinnings were ideal for pulpwood, that there was an urgent demand for pulpwood at high prices, but that efforts by arrangements with two pulp mills during the past year to accomplish substantial production of pulpwood had failed because of bad weather, shortage of equipment and insufficient labor. He further advised that for plaintiff to attain maximum growth of its timber, plaintiff had to solve the attendant problems and undertake to cut annually for a number of years at least ten times as much pulpwood as was produced during the preceding year.
48. In its management and utilization of its timber lands, plaintiff developed and used fire control procedures and various forestry practices to protect and improve its timber stands, some of which procedures and practices were then new and experimental but have since been adopted and *472 utilized in the management of both public and private forests. As a result of plaintiff’s forestry management practices and the general increase in the value of timberlands in the southeast United States during that period, plaintiff succeeded in improving its timber stands and the value of subject timber-lands over the period from 1926 through 1947.
49. From 1926 through 1947, plaintiff regularly did road-building work, and by the time St. Regis took possession plaintiff had built at least 200 miles of roads in the Suwannee Forest.
50. By 1946 and 1947, the Suwannee Forest was a well-stocked stand of timber, but it was in the main a young forest, with a lesser number of trees of sufficient size for sawtimber, but a majority suitable for pulpwood with practice of commercial thinning of the timber. However, plaintiff had no substantial market for pulpwood available. A mill was operating at Jacksonville, Florida, but its supply of pulpwood was from timberlands in its immediate vicinity, whereas plaintiff’s land was 70 miles removed by rad.
51. During 1946 plaintiff negotiated with Rayonier Paper Company for sale of timber for pulpwood, and in a number of meetings during that year, representatives of these parties drafted terms of a proposed agreement, similar to the provisions of subject contract, except that average annual growth of timber on subject land was considered to be 1 cord per acre per year, rounded to 200,000 cords. In late 1946, or early 1947, plaintiff’s president and its attorney went to Rayonier’s office at New York City with the intention of executing the agreement, but no agreement was reached because Rayonier withdrew from further negotiations.
52. Shortly thereafter, plaintiff and St. Regis commenced negotiations which culminated in the execution of subject agreement on August 27,1947. Plaintiff proposed to St. Regis that the parties agree that the current rate of average annual growth of timber on subject land was about 1 cord per acre per year, or 200,000 cords. St. Regis declined to agree. St. Regis was contemplating the construction of a pulp mill within reasonable distance of subject land, at Valdosta, Georgia, or Jacksonville, Florida, but design and construe *473 tion would require a substantial period of time, and St. Eegis would not be in an economic position to utilize in its own operations large quantities of pulpwood produced from such land for several years. To reduce the agreed amount of average annual growth, as proposed by plaintiff, St. Eegis countered with the proposal that timbered swamplands be eliminated from the agreement. Plaintiff opposed the separation of the swamplands from the rest of the forest on the basis that recurring conflicts and difficulties would exist between the parties in their management and operation of their respective parts of the overall area. Plaintiff then proposed that the agreed average annual growth of timber on the entire tract be % of a cord per acre per year, specifically 150,000 cords, which eventually was the amount used in subject agreement, subject to the provisions concerning increase or decrease in average annual growth.
53. The provisions of subject agreement concerning the cutting of the average annual growth of timber were drafted, as were the similar provisions in the proposed Eayonier agreement, to carry out the purpose of plaintiff’s forest manager (who became its president in late 1946 or early 1947) to accomplish a long-term sustained-yield contract, pursuant to which maximum production of timber would be realized on subject land, with utilization of timber at the same rate it was being produced, so that theoretically there would be on hand at the termination of the contract substantially the same amount of timber that existed at the commencement of the contract term.
54. When subject contract was executed, St. Eegis had a pulp mill at Pensacola, Florida, and it owned large areas of timberlands in Florida, Alabama, and Mississippi. In the early years of the term of subject contract, St. Eegis did ship some pulpwood from subject land to its Pensacola mill, but only when such mill was experiencing a shortage of supply of wood, because freight rates from subject land to Pensacola were high. In such years, most of the timber cut by St. Eegis from subject land was otherwise utilized or disposed of to carry the land until a reasonably close pulp mill could be con *474 structed and operated. About 1950, St. Regis commenced construction of its pulp mill at Jacksonville, Florida, which commenced operations about 1952. In the meantime, St. Regis constructed and operated a sawmill at Fargo, Georgia, near the eastern boundary of subject land, but in time closed such operations.
55. At the time of the trial of this case in 1971, St. Regis had an investment in its Jacksonville pulp mill facilities in excess of $100 million. The supply of pulp wood for such mill has been obtained about 30 percent from land owned in fee by St. Regis, and about 70 percent from lands under contract to St. Regis, such as the subject land. The cost to St. Regis of supplying pulpwood from such lands was considerably less than purchases of pulpwood on the open market would have been.
56. From March 17, 1953, to August 1, 1953, the forest management consulting firm of Pomeroy & McGowin conducted a timber cruise survey of subject land jointly for plaintiff and for St. Regis, and submitted their revised report on March 1,1954.
Such report advised that subject land was determined to have 215,540 'acres, of which 188,872 acres of timbered land had almost all of the timber, with very little on the 23,175 acres of cull or understocked woodland, and none on the 3,493 acres of open land.
The rate of growth of timber on subject land was calculated to be 168,000 cords per year as of 1953.
57. The condition of the Suwannee Forest in 1953 was that it was a well-stocked pine timberland, although in many areas the timber stands were understocked with pine trees, and there was a substantial acreage of unstocked woodland. It had potential for increased annual growth by intensive cutting of existing trees whose growth had been slowed by their use in naval stores operations, and by the practice of intensive forest management, especially thinning of existing dense stands of timber, planting of the faster-growing type of pine tree in the reforestation program to replace other pine trees and other species of trees to be cut, and by plant *475 ing of the unstocked woodland. Eealization of the potential for increased annual growth was also contingent upon absence of catastrophic fire or disease infestation in the forest.
,58. The years 1954 and 1955 were both drought years for the Suwannee Forest. In 1954, 101 fires burned 2,200 acres, considered individually small fires, but in June 1955, a catastrophic fire burned 70,000 acres of subject land.
59. The June 1955 fire substantially reduced the average annual growth of timber on subject land.
While the annual growth of timber had been calculated as 168,000 cords by Pomeroy & McGowin for 1953, the year following the commencement of operation of the Jacksonville mill of St. Kegis, the June 1955 fire occurred before plaintiff could take steps pursuant to contract provisions, requiring arbitration if the parties could not agree, to increase to an amount in excess of the originally agreed annual minimum of 150,000 cords, the amount of timber St. Kegis had to cut or pay for annually. Because of the fire, and up to the time of trial of this case in 1971, plaintiff has never sought to increase cutting or payment requirements on the basis of increased annual growth. Plaintiff does not intend to do so until annual growth is brought back above the minimum annual amount specified by the contract.
60. By reason of the contract provision summarized in finding 23 above, the number of cords St. Regis could cut in future years was also reduced by the June 1955 fire.
While production of cords by St. Kegis was substantially in excess of the annual minimum of 150,000 cords in the years 1955 and 1956, as shown by the schedule mentioned in finding 40 above, such high production is reasonably explained in terms of the salvage operations which St. Kegis must have undertaken to preserve its rights pursuant to the provisions relating to reduction of cutting on account of forest fires on subject land. As shown by the same schedule, cutting by St. Kegis fell off drastically during the years 1957 through 1962, resulting in a substantial backlog for each of those years.
61. As of December 31, 1967, the uncut backlog for each of the years 1951,1952,1957 through 1962, and 1967, and the *476 year of expiration of the right of St. Eegis to cut such backlog for each of such years were as follows:
Year Cords Year of
expiration
1951 19, 408. 55 1976
1952 63, 631. 32 1976
1957 88, 552. 78 1969
1958 62, 609. 47 1970
1959 61, 785. 52 1971
1960 66, 679. 71 1972
1961 59,172. 96 1973
1962 48, 986. 19 1974
1967 18, 892. 65 1979
The uncut backlog of each of these years prior to 1967 was the same as of December 31, 1965, except that for the year 1951, the backlog was then 39,197.03 cords.
62. In the first 22 years of the term of subject contract. 1948 through 1969, as shown by the schedule mentioned in finding 40, there were 14 years in which St. Eegis cut less than the annual minimum of 150,000 cords, thus creating backlogs. Of course, the eight high production years, 1953 through 1956 and 1963 through 1966, served to reduce backlogs for prior years.
Lapses of the right of St. Eegis to cut backlogs were the 88,553 uncut cords for 1957 at the end of 1969, and the 62,609 uncut cords for 1958 at the end of 1970.
Plaintiff’s board of directors rejected a proposal by St. Eegis to extend the time for cutting of the 1958 backlog.
63. As of July 1971, the unexpired uncut backlog was about 500,000 cords for the preceding 11 years.
64. In its management of the Suwannee Forest, St. Eegis employed the forest industry practice of continuous forest inventory (CFI) pursuant to which it had permanently established some 1,236 cruise plots scattered on a grid pattern throughout the forest. The plan was that every 10 years the same plots would be cruised to determine by such sampling the volume and growth of timber. As part of its re-inventory conducted in 1961, St. Eegis retained Associate Professor Charles W. Ealston, School of Forestry, Duke University, an expert on forest soils and productivity, to investigate and advise as to how much pulpwood St. Eegis could *477 potentially produce on subject land in a 30-year rotation of sustained yield under good forestry practice. His assignment was to assess what the land could produce, not what it was producing.
Professor Ealston had the cruisers for St. Eegis obtain and record data from 581 representative GFI plots as to different land types, determined from soil borings, and observation of soil profile, ground vegetation and topographic features. The cruisers also measured the age, by use of increment borers, and the heights of various pine trees in stands of slash pine in 200 GFI plots and of longleaf pine at 145 sample points. Only sound trees, not adversely affected by disease, turpentining, or fire, which were also the dominant trees, not inhibited in growth by density of the timber, were measured. Information on soil, vegetation and topography was also collected in the areas where the tree measurements were made.
Using the data and information thus obtained, Professor Ealston calculated by use of authoritative site index curves and standard yield tables and advised St. Eegis that on a 30-year rotation of sustained yield, subject land as a fully stocked pine plantation would have potential pulpwood productivity of 0.90 cords per acre per year for longleaf pine and 1.27 cords per acre per year for slash pine. He noted that longleaf pine sites represented 75.2 percent of the total forest area. His opinion was that by converting all of the subject land to slash pine plantations and eliminating the substantial amounts of longleaf pine and the hardwood and cypress trees, St. Eegis by good forestry management could increase annual growth to about 240,000 cords per year.
In his visits to the Suwannee Forest in 1961, Professor Ealston observed that there were still substantial quantities of worked-out pine trees, areas of trees in need of thinning, and understocked woodland areas, and stated in his testimony at the trial of this case that on property the size of subject land, it takes time to provide any kind of good forestry management practice, and expressed his judgment that at least two pulpwood rotations, or 60 years, would be required to attain a sustained yield in accordance with bis assessment of the potential productivity of subject land.
*478 65. Prior to 1960, most of the areas of subject land cut by St. Regis were naturally seeded for new growth, of trees. The first large planting of seedlings by St. Regis was in 1960. During the succeeding 10 years, St. Regis consistently employed the silvicultural or clear cutting method of timber removal, reforesting such areas by planting of seedlings by machine or by hand. By 1971, such plantations had an average age of 5 or 6 years, and a majority of all existing plantations were less than 10 years old.
66. In July 1968, St. Regis caused its Jacksonville silvi-culturist, previously experienced in forestry operations research and inventory control, to submit his report of his study of the harvesting of timber from subject land over the remaining years of subject contract in order to determine the possible recovery of backlog. Mr. Oettmeier, plaintiff’s president, who as its assistant and then principal forest manager had been intimately acquainted with the Suwannee Forest since 1926, reviewed this projection of St. Regis operations, and reported to plaintiff’s directors and stockholders that he estimated that St. Regis would lose its right to cut over a million cords of backlog before St. Regis could increase its cutting to the annual minimum of 150,000 cords, if plaintiff did not extend the 12-year periods for cutting of backlog.
The St. Regis silviculturist projected that due to substantial shortages of merchantable timber in the Suwannee Forest, and due to the time that would be required for plantations to mature sufficiently for timber cutting, St. Regis would cut considerably less than 150,000 cords per year in the period 1968 through 1983, accumulating a backlog somewhat in excess of two million cords.
It was projected that St. Regis would be able to cut substantially in excess of 150,000 cords per year in the years 1984 through 2007, in which event, it would be able prior to the end of the contract term, to cut all of the accumulated backlog, if the 12-year limitation on the removal of backlog were waived.
The report of the St. Regis silviculturist stated that the projection covered a pet'iod of 40 years and was based upon data subject to innumerable variables, and that the conclu *479 sions could not be considered binding although the best data and techniques known were used.
87. Pursuant to the stipulation of the parties at the pretrial conference in these consolidated cases, as was ordered by the trial commissioner, the trial of these cases was limited to the issues of law and fact relating to the right of plaintiff to recover, reserving the determination of the amounts of recovery, if any, for further proceedings.
Ultimate FINDINGS AND CONCLUSIONS
68. Plaintiff was allowed long-term capital gain treatment on all of its proceeds from the St. Eegis agreement on its Federal income tax returns for taxable years prior to 1965. It was also allowed such treatment on part of such proceeds for taxable year 1965, the earliest year in issue. Such cumulative allowances brought the total amount of such proceeds thus treated up to the full market value of existing timber as of the time of the commencement of the 60-year term of the St. Eegis agreement.
The partial allowance of capital gain treatment for 1965 was made by the Internal Eevenue Service pursuant to Eev. Eul. 62-81 on the theory that under §§ 1221 and 1231 of the Internal Eevenue Code of 1954, there was a sale of capital assets (existing timber) at the commencement of the contract term at the then market value, but that plaintiff’s proceeds from the agreement in excess of such market value were ordinary income. Eev. Eul. 62-81, 1962-1 Cum. Bull. 153, applied in Dyal v. United States, 342 F. 2d 248, 252 (5th Cir. 1965).
Plaintiff’s entitlement to the long-term capital gain treatment, to the extent allowed by the Internal Eevenue Service, is not in issue in these cases.[1] The only issues herein relate to the tax treatment to be accorded to plaintiff’s proceeds in 1965, 1966 and 1967 in excess of the fair market value of existing timber at the commencement of the term of the St. Eegis agreement.
*480 69. For plaintiff to be entitled to long-term capital gain treatment under § 631 (b) of tbe Internal Revenue Code of 1954, with, respect to its proceeds from the St. Eegis agreement during taxable years 1965, 1966, and 1967, it must be shown that: (1) plaintiff was the owner of the timber; (2) plaintiff by agreement disposed of its timber to St. Regis, but retained an economic interest; and (3) plaintiff had held such timber for more than 6 months prior to its disposal. Varn, Inc. v. United States, 192 Ct. Cl. 272, 283, 425 F. 2d 1231, 1236 (1970); Barclay v. United States, 166 Ct. Cl. 421, 428, 333 F. 2d 847,852 (1964).
Because of the provisions of the St. Regis agreement as summarized in the foregoing findings of fact, and the facts and circumstances relevant to the taxable years in dispute, there are overtones of dispute between the parties as to the existence of each of such elements. The dispositive issue, however, is whether plaintiff held an economic interest in the timber on its land during the taxable years in issue.
70. In the application of the Federal income tax law, the courts look to the events in each tax year, Burnet v. Sanford & Brooks Co., 282 U.S. 359 (1931), and to the facts and circumstances as they exist in the taxable years in dispute with respect to a long-existing course of dealings. Sayles Finishing Plants, Inc. v. United States, 185 Ct. Cl. 196, 203, 399 F. 2d 214, 218 (1968); Cuyuna Realty Co. v. United States, 180 Ct. Cl. 879, 885, 382 F. 2d 298, 301 (1967).
71. Upon consideration of all of the terms and conditions of the St. Regis agreement, and all of the facts and circumstances relevant to the taxable years in dispute, it is concluded:
The St. Regis agreement is construed in substance as a lease by plaintiff to St. Regis of the surface rights to and the improvements on subject land for St. Regis as lessee to conduct tree farm operations thereon. Plaintiff’s proceeds from such agreement for the taxable years in issue, and the payments by St. Regis for the benefit of plaintiff of all ad valorem and severance taxes assessed against the land and the timber and improvements thereon, constitute rentals received by or credited to plaintiff for the use by St. Regis of the land and improvements.
*481 St. Eegis is obligated to make payments to plaintiff measured by the specified unit price and volume of timber, irrespective of the amounts of timber cut, or available to be cut, and such amounts are payable in advance in the traditional manner of rentals. Plaintiff did not have an economic interest in the timber on subject land during the taxable years in issue, because plaintiff’s income generated by the St. Eegis agreement was not contingent upon severance of the timber, nor payable to plaintiff solely out of the proceeds from the natural resource itself.
Plaintiff is not entitled to recover under § 631(b) of the Internal Revenue Code of 1954. Palmer v. Bender, 287 U.S. 551 (1933); Crosby v. United States, 414 F. 2d 822, 825 (5th Cir. 1969); Dyal v. United States, supra; Boeing v. United States, 121 Ct. Cl. 9, 28, 98 F. Supp. 581, 585 (1951) ; Huxford v. United States, 299 F. Supp. 218, 221 (N.D. Fla. 1969). Cf. Union Bag-Camp Paper Corp. v. United States, 163 Ct. Cl. 525, 325 F. 2d 730 (1963); Estate of James M. Lawton, 33 T.C. 47, 53-54 (1959).
These conclusions are reached without reliance on Georgia court decisions regarding plaintiff’s state income tax liabilities on its proceeds from the St. Eegis agreement under Georgia statutes. Superior Pine Products Co. v. Williams, 214 Ga. 485, 106 S.E. 2d 6 (1958); Superior Pine Products Co. v. Hawes, 119 Ga. App. 201, 166 S.E. 2d 620 (1969), aff'd 225 Ga. 392, 169 S.E. 2d 126 (1969).
72. Because plaintiff had no economic interest in the timber cut by St. Eegis in the taxable years in dispute, but at best bare legal title for security purposes, and because St. Eegis had the beneficial ownership of the timber on the land in the taxable years in issue, it follows that such timber was not a capital asset held by plaintiff.
Plaintiff is not entitled to recover pursuant to §§ 1221 and 1231 of the Internal Revenue Code of 1954. Dyal v. United States, supra; Union Bag-Camp Paper Corp. v. United States, supra, 163 Ct. Cl. at 538, 325 F. 2d at 737; Rev. Rul. 62-81, supra.
73. Defendant’s counterclaim in Docket No. 319-68 was conceded by its’ assigned attorney at the trial of these cases, *482 no evidence was presented with respect thereto, and such counterclaim should be dismissed.
Conclusion on Law
Based upon the foregoing findings of fact, conclusions of law and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that neither plaintiff nor defendant is entitled to recover, and plaintiff’s petitions and defendant’s counterclaim are dismissed.

 The varying views oí this court and the Fifth Circuit with respect to the scope of recognition of capital gain in the application oí Rev. Rui. 62 — 81, as expressed in Union Bag-Camp Paper Corp. v. United States, 177 Ct. Cl. 212, 216, 366 F. 2d 1011, 1014 (1966), and in Dyal v. United States, 342 F. 2d 248, 252 (5th Cir. 1965), seem irrelevant to the issues herein.